GEORGE CAMPEN, Plaintiff-Appellee, *v.* EXECUTIVE HOUSE HOTEL, INC., Defendant-Appellant.

First District (5th Division)    No. 80-2775

Opinion filed March 31, 1982.

John B. Grogan, of Chicago (William J. Harte and Karen Hamity, of counsel), for appellant.

Ronald G. Fleisher, of Karlin & Fleisher, Ltd., of Chicago (David A. Novoselsky, of counsel), for appellee.

JUSTICE LORENZ delivered the opinion of the court:

Plaintiff fell in the lobby of the Executive House Hotel on January 4, 1975, and after trial by jury he was awarded $150,000 in damages based on allegations that the accident was caused by the hotel corporation's negligence. Defendant now argues that the trial court committed reversible error in making the following nine rulings:

(1) concluding that defendant unreasonably refused to comply with the supreme court discovery rules (73 Ill. 2d R. 219(c));

(2) excluding the testimony of several defense witnesses as a sanction for this violation;

(3) instructing the jury that it could infer that unproduced evidence was unfavorable to defendant, although the unproduced evidence was excluded by the court as a discovery sanction;

(4) refusing to permit defendant to raise the defense that, allegedly, the sole cause of plaintiff's injuries was the negligence of an independent contractor;

(5) denying defendant's request for an order commanding plaintiff to comply with a notice for production of documents (73 Ill. 2d R. 237(b));

(6) permitting a physician to give an expert opinion based on X rays which were not available for use in cross-examination;

(7) refusing, during cross-examination, to permit plaintiff's medical expert to refer to an X ray report which the doctor referred to during direct examination;

(8) excluding evidence of admissions which plaintiff made, during discovery, about his medical history;

(9) refusing to permit defendant to examine X rays which plaintiff's physician took of plaintiff the day before trial commenced.

The following facts are material to our decision:

The complaint's principal allegation of negligence is that defendant caused plaintiff's accident by waxing the terrazzo floor on which plaintiff fell. Defendant denied that it used wax on the floor, and defendant did not dispute that wax should never be used on terrazzo floors because it makes them extremely slippery.

The defense theories are that (1) plaintiff's left knee spontaneously buckled because of pre-existing instability, and (2) much of plaintiff's pain and injuries were caused by (i) a childhood accident in which his left knee was injured, and (ii) 1978 surgery in which a tumor was removed from the upper portion of his left thigh bone.

On March 4, 1977, plaintiff served interrogatories on defendant requesting, among other things, that defendant identify who maintained the lobby floor at the time of the accident. More than a year and a half later, defendant, acting through its general manager, Robert Dangoia, answered this inquiry by stating, under oath, that the hotel lobby was maintained by hotel employees at the time of the accident. The truth, however, was that, at the time of the accident, janitorial services for the hotel lobby were provided by Amity Building Service Corporation. Amity's contract with Executive House began in 1973, and it did not terminate until April 1976. Nevertheless, defendant's interrogatory answers made no reference to, and did not even hint at, the existence of Amity Building Service Corporation.

In the spring of 1980, plaintiff petitioned to have his case advanced on the trial call; the supporting affidavit stated that he had cancer of the pancreas and had a life expectancy of only a few months.

The case was advanced, and there were two pretrial conferences with the court. Defendant's trial attorney did not mention, at either one of these conferences, that he intended to file a notice for production of documents. However, the day before the trial commenced, defendant filed a document which requested production of the following items:

(a) The statements of "all persons or witnesses";

(b) Names and addresses of any persons having knowledge of defendant's lobby floor on January 4, 1975;

(c) Names and addresses of all persons who have any knowledge of the methods used in maintaining the lobby floor;

(d) Names and addresses of any persons having any knowledge of the use of any wax product on the floor;

(e) The name and address of the supplier of the wax;

(f) Brochures or documents relating to any floor care products applied to the floor;

(g) The names and addresses of any of defendant's own employees who have any knowledge of how the floor was maintained;

(h) All of the plaintiff's medical records;

(i) Any reports prepared by the architectural expert who testified for plaintiff.

Immediately after opening statements were made to the jury, defendant's trial attorney first brought this "notice" to the attention of the trial court. Defendant's request for court ordered compliance with its "notice" was denied by the court on the grounds that it constituted an untimely attempt to obtain "shotgun" discovery by a litigant which had not diligently pursued the pretrial discovery procedures which would have permitted it to obtain the evidence which it first sought during trial.

Plaintiff testified that he was walking on the terrazzo floor in the lobby of the Executive House Hotel on January 4, 1975, while wearing rubber soled shoes, when his right leg shot straight out, his left leg twisted to his side, and he fell on his seat. He described his excruciating and continuing pain, and he claimed $9,000 in medical bills, $11,000 in lost wages, and $2,000 in expenses for his wife to come from Texas and stay in Chicago during his 10-week hospitalization. According to plaintiff, the injury caused a severe limp in addition to continuing pain. Also, he had trouble sleeping, could not enjoy sports—even as a spectator, could not sit through a movie, had to be driven around by his wife, had trouble getting in and out of cars, and was unable to work full time.

During cross-examination, plaintiff, who was 60 years old at the time of trial, admitted that he injured his left knee when he was four or five. But he denied knowing whether this old injury caused any instability in his left knee. Plaintiff also denied knowing whether this childhood injury caused any ligament damage in the knee. Responding to this testimony, defendant's attorney attempted to elicit evidence that (a) during his discovery deposition plaintiff said he thought that there was some ligament damage from the childhood injury, and (b) in his answers to defendant's interrogatories, plaintiff stated that the old injury caused "moderate instability" in the knee joint.

The trial court excluded evidence of these statements on the grounds

that they were not impeaching and that, because plaintiff was an infant at the time of the old injury, his statements during discovery were necessarily based on the hearsay statements of others rather than on his own personal knowledge.

The first mention of the existence of Amity Building Service came when plaintiff called Ruth Matthews as a witness. Matthews worked for Amity between January 1974 and January 1975 as the supervisor of the Amity crew that worked at the Executive House Hotel. Despite the fact that defendant denied that wax was used on the lobby floor, Matthews testified that the terrazzo floor in the Executive House Hotel was waxed once a week. According to Matthews, the cans used by the Amity crew were labeled "wax," and occasionally the floor was so slippery that Matthews had to order the crew to correct the dangerous condition.

Although defendant argues on appeal that evidence of the existence of Amity would not have damaged its defense, its post-trial motion states that the testimony given by Matthews—evidence directly derived from plaintiff's independent discovery of the existence of Amity—was "a blow to the solar plexus of the defendant's defense theories from which defendant never recovered, nor could."

Harry Fear, the man who was general manager of the Executive House at the time of the accident, also testified that the terrazzo floor in the lobby of the hotel was waxed once a week and that, occasionally, it was extremely slippery. Furthermore, an occurrence witness who was an acquaintance of plaintiff's testified that the terrazzo floor on which plaintiff fell was slick and shiny like the terrazzo floor in the witness' home when it had once been waxed by mistake.

Plaintiff's medical expert, Dr. William F. Kernahan, an orthopedic surgeon and assistant professor of medicine at Northwestern University School of Medicine, treated plaintiff immediately after the accident and throughout his hospitalization.

The doctor testified that the fall in the lobby of the Executive House Hotel caused a fracture which had a lot of small fragments, and which ran all the way down the left thigh bone and into the knee joint. His opinion on the extent of fragmentation, and the length of the fracture, was based on his examination of the X rays which were taken in the emergency room.

In addition to revealing the extent of the fracture, the X rays showed that plaintiff suffered from a long-term "wear and tear" arthritic degeneration which, according to Dr. Kernahan, was caused by the injury plaintiff suffered when he was four or five. As a result of this "wear and tear" arthritis, plaintiff had a reduced range of motion in the joint of his left knee. Dr. Kernahan testified that it was unlikely that this long-standing

arthritic condition could have caused instability in the knee, although it was possible.

His expert opinion was that the 1975 accident increased the arthritic degeneration in plaintiff's left knee, and that most of plaintiff's continuing pain was related to this degeneration, but that (a) the 1978 surgery on the thigh bone was bound to have some relationship to the pain, and (b) one of the major reasons for the atrophy of plaintiff's thigh muscles was the fact that he had not yet fully recovered from the 1978 surgery.

Although Dr. Kernahan's expert opinion was partially based on his interpretation of the emergency room X rays, those X rays had been sent to plaintiff's physician in Texas for use in follow-up treatment, and they were not available for use in cross-examination of Dr. Kernahan. Defendant moved to strike the doctor's testimony, but this motion was denied.

As part of a follow-up examination, Dr. Kernahan had more X rays of plaintiff taken the day before trial commenced. The new X rays were available in the courtroom, and defendant's attorney asked the court to permit him to take those X rays to a defense expert during a weekend break in the trial. The trial court denied this request on the grounds that (a) the doctor did not use the new X rays in his testimony; (b) the new X rays had not been introduced into evidence; and (c) defendant had not availed itself of the opportunity to request a pre-trial medical examination of plaintiff. See 73 Ill. 2d R. 215.

During its case in chief, defendant sought to introduce testimony concerning the materials and methods used by Amity in maintaining the terrazzo floor. According to defendant's offer of proof: (1) Amity's purchasing agent would present evidence that Amity purchased non-wax acrylic floor products; (2) representatives of the manufacturers of these chemicals would testify that the products were non-wax acrylics which were slip-resistant; (3) Ruth Matthews' supervisor would testify that Amity never used wax on the Executive House terrazzo, and that the floor was never slippery.

Plaintiff claimed that he was unfairly surprised by this evidence because he had prepared for trial relying on the interrogatory answer in which Executive House, acting through its agent, swore that its own employees maintained the floor. Plaintiff requested that the court exclude these witnesses as a sanction for defendant's failure to disclose its knowledge of the existence of Amity.

In an attempt to prove that it took reasonable steps to comply with the discovery rules, defendant presented Robert Dangoia's testimony about what he did before answering plaintiff's interrogatories. According to Dangoia, he checked with several Executive House employees, including the bell captain, Philip Fara, before answering that the floor had

been maintained by Executive House employees. However, Fara testified that he knew that Executive House once used an outside firm to maintain the lobby floor.

Plaintiff's attorney admitted that he discovered the existence of Amity a month before trial, but the attorney also informed the court that, when interviewed by the attorney and his investigator, the officers of Amity claimed that their employees never put anything on the floor of the Executive House lobby other than water and detergent. The attorney said he continued to investigate further, and he was able to find Ruth Matthews two days before she testified. Moreover, when she testified, Matthews confirmed that plaintiff's attorney first contacted her two days before she was called as a witness.

The trial court found that defendant unreasonably refused to comply with the supreme court discovery rules, and plaintiff's motion to exclude was granted. The court explained the rationale for its ruling in a memorandum opinion:

"Defendant, who had not disclosed the existence of Amity, wanted after becoming aware that plaintiff had learned of their existence, to call employees to testify as to the nature, source, application and effect of alleged polymers. If that were to be allowed, the plaintiff would be required to change the direction and effect of his presentation without the opportunity to depose, research, or adequately rebut their surprise testimony. Under the circumstances the court could not give that unfair advantage to the defendant, rewarding it for its admitted lack of preparation and punishing the plaintiff for his evident diligence."

In addition to the sanction of excluding four defense witnesses, the court gave Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971)) (hereinafter cited as IPI Civil), which permitted the jurors to infer that withheld evidence is unfavorable to the withholding litigant.[1]

Relying on this instruction, plaintiff's attorney argued to the jurors that defendant's failure to produce witnesses to testify about what substances Amity applied to the terrazzo floor justified inferring that the floor was waxed.

In addition, the court refused to instruct the jury that it could find

---

[1] "If a party to this case has failed to offer evidence and to produce a witness within his power to produce, you may infer that the evidence and testimony of the witness would be adverse to that party if you believe each of the following elements:

1. The evidence and witness are under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The evidence and witness are not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have offered the evidence and produced the witness if he believed the evidence and the testimony would be favorable to him.

4. No reasonable excuse for the failure has been shown." Plaintiff's Instruction No. 8.

that Amity, as an alleged independent contractor, was solely liable for plaintiff's injuries. (IPI Civil Nos. 12.04 and 50.10.) This ruling was partially based on the court's conclusion that defendant failed to present sufficient evidence to justify giving these instructions. However, the memorandum order's discussion of this issue shows that, in refusing to give these instructions, the trial court also considered the fact that "the 'mysterious' Amity Company [was] a third party whose existence was denied during pre-trial by the defendant, although its relationship was peculiarly and particularly within the knowledge of the defendant." Thus it is clear that the decision to preclude defendant from escaping responsibility for plaintiff's injuries by attempting to shift sole liability to Amity was another sanction against defendant for secreting knowledge of Amity's existence.

OPINION

I

The initial question is whether the trial court erred in finding that defendant unreasonably refused to comply with the supreme court discovery rules. (73 Ill. 2d R. 219(c).) Our task on review is to determine whether it was against the manifest weight of the evidence for the trial court to find that (a) defendant refused to comply with the supreme court discovery rules, and (b) that this refusal was unreasonable.

Responding to the first part of the inquiry, defendant argues that it did not "refuse" to reveal the existence of Amity because it cannot be charged with having had knowledge of Amity at the time the interrogatories were answered. According to defendant:

(a) Robert Dangoia, the corporate officer who answered the interrogatories on behalf of his employer, did not work at Executive House at the time of plaintiff's accident;

(b) Dangoia took reasonable steps to insure that Executive House fully and accurately answered the interrogatories;

(c) the other Executive House employees Dangoia conferred with before answering the interrogatories neither knew of nor recalled the existence of Amity; and

(d) the current Executive House officers have limited knowledge of events concerning the corporation which took place in 1975 because, in 1978, there was a management shakeup.

Despite the alleged ignorance of defendant's current officers, the appropriate inquiry is whether the corporate defendant itself had imputed knowledge of the undisclosed information when the interrogatory answers were due.

■■■ Corporations are artificial legal entities, and the only knowledge which a corporation can be said to have is the knowledge which is

imputed to it under principles of agency law. (3 Fletcher, Cyclopedia Corporations §787, at 9 (1975).) Thus, knowledge which a corporate agent receives while acting within the scope of his or her agency is imputed to the corporation if the knowledge concerns a matter within the scope of the agent's authority. (*United Disposal and Recovery Co. v. Industrial Com.* (1920), 291 Ill. 480, 485, 126 N.E. 183.) And, once an agent's knowledge is imputed to a corporation, the imputed knowledge is not affected by changes in the corporation's personnel. *Microbiological Research Corp. v. Muna* (Utah 1981), 625 P.2d 690, 695; see also Restatement (Second) of Agency §278, comment b, at 606 (1958).

In the present case, defendant admitted that it had a contract with Amity Building Services when plaintiff was injured. Since this contract was admittedly valid, it necessarily follows that at least one of defendant's agents or officers entered into this contract while acting both on behalf of defendant and within the scope of his or her authority. Defendant, therefore, had imputed knowledge of this contract, and the corporation's imputed knowledge must be considered as having continued to exist at least through April of 1976 when the contract with Amity terminated. But, even though plaintiff's interrogatories were served on defendant in March of 1977, less than a year after the contract with Amity terminated, defendant took more than a year and a half to respond. Then, because of personnel changes which allegedly occurred during this unexplained delay, defendant argues that it can no longer be charged with knowledge of the existence of Amity. However, Supreme Court Rule 213(c) (73 Ill. 2d R. 213(c)) required defendant to respond to the interrogatories within 28 days of when they were served.

■ We cannot permit defendant to take advantage of its own neglect, and, consequently, it is appropriate to focus on the knowledge which defendant imputedly had in 1977 when the interrogatory answers were due. Under the circumstances of this case, it was not manifestly wrong for the trial court to find that, when the interrogatory answers were due— about a year after the contract with Amity terminated—defendant continued to have imputed knowledge of the existence of Amity. See, *e.g.*, *United States v. Barket* (8th Cir. 1976), 530 F.2d 189 (applying general principles of agency law, it was not manifestly erroneous for the district court to impute knowledge to the government more than two years after the imputed information was received by a government agent).

■ When interrogatories are addressed to a corporate litigant, Supreme Court Rule 213(c) requires that the sworn answers "shall be made by an officer * * * or agent, who shall furnish such information as is available to the party." (73 Ill. 2d R. 213(c).) This special provision was added to insure that a corporation, or similar entity, "may not avoid answering an interrogatory by disclaiming personal knowledge of the matter on the

part of the answering official." (Ill. Ann. Stat., ch. 110A, par. 213(c), Committee Comments, at 180 (Smith-Hurd 1968).) Therefore, when interrogatories are addressed to a corporate litigant, the officer or agent who answers the interrogatories must supply the material information which is imputedly available to the corporation. *General Dynamics Corp. v. Selb Manufacturing Co.* (8th Cir. 1973), 481 F.2d 1204, 1210 (construing a clause in Federal Rule of Civil Procedure 33(a) which is identical to the pertinent portion of our Rule 213(c)).

Since defendant had imputed knowledge of the existence of Amity, it necessarily follows that defendant violated Rule 213(c) when it failed to supply information which was requested by plaintiff and which was, under principles of agency law, known by the corporation.

The next question is whether it was against the manifest weight of the evidence for the trial court to find that defendant's refusal to comply with Rule 213(c) was unreasonable. 73 Ill. 2d R. 219(c).

An implicit requirement of Rule 213(c), when read in light of Rule 219(c), is that an agent or officer who answers interrogatories on behalf of a corporation must take reasonable steps to search the "corporate memory" by (1) investigating the contents of the corporation's records, and (2) trying to ascertain the knowledge of other corporate agents.

Obviously, the information about what steps a litigant has taken to comply with the discovery rules is peculiarly within the litigant's knowledge. Thus, once a court finds that there has been a refusal to comply with the discovery rules, the burden is on the noncomplying party to show that the refusal was reasonable. *Sanchez v. Phillips* (1977), 46 Ill. App. 3d 430, 434, 361 N.E.2d 36.

In an attempt to meet this burden, defendant presented testimony from Robert Dangoia on the steps he took before answering plaintiff's interrogatories. According to Dangoia, he conferred with Philip Fara before giving defendant's sworn answers. However, Fara testified that he knew of the existence of an outside maintenance firm. Under these circumstances, it was not manifestly wrong to find that reasonable investigation by Dangoia would have revealed the existence of Amity. Consequently, it was not against the manifest weight of the evidence for the court to find that defendant's refusal to comply with Rule 213(c) was unreasonable under Rule 219(c).

## II

The second issue is whether the trial court abused its discretion in excluding the testimony of four defense witnesses as a sanction for defendant's violation of the discovery rules. When there has been an unreasonable refusal to comply with the discovery rules, Supreme Court Rule 219(c) authorizes courts to impose such sanctions as are "just" under

the circumstances of the case, including barring a witness from giving testimony which is reasonably related to the discovery violation. 73 Ill. 2d R. 219(c).

We recognize that punishment of litigants is not the goal of the discovery rules; but the sanctions provided by Rule 219(c) are a necessary means to reach our ultimate goal: the speedy, efficient, and just resolution of cases. The discovery rules are designed to further this goal by improving the process used for obtaining that essential ingredient of justice—truth. Yet, inevitably, unless there are swift and sure sanctions for unreasonable refusals to comply with the discovery rules, many litigants will fail to fully and accurately comply with these provisions. As the supreme court instructed us:

> "Our discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation. Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances." *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 67, 374 N.E.2d 460.

■■ There is a great danger that discovery violations, such as the one in the present case, will remain forever undisclosed. Not every attorney will be as tenacious, and lucky, in uncovering withheld evidence as plaintiff's attorney in this case. Therefore, when acting to make the discovery rules effective procedures for uncovering truth rather than meaningless promises, and in determining whether a sanction is "just" under the circumstances of a particular case, it is appropriate to consider the need for using discovery sanctions as a general deterrent which will provide a strong incentive for *all* litigants to fully and accurately comply with the discovery rules. Consequently, reviewing courts must give a large degree of deference to a trial court's decision to impose sanctions for discovery violations.

In this appeal, defendant argues that plaintiff knew or should have known of the testimony the excluded witnesses allegedly would have given. Thus, defendant concludes that plaintiff was not prejudiced by the discovery violations, and that the sanctions imposed by the court were not "just."

■■ We disagree. Although plaintiff's attorney independently discovered the existence of Amity a month before trial, he also informed the court that the officers of Amity told him that Amity employees did not apply anything to the terrazzo floor other than water and detergent. Under these circumstances, it was not manifestly wrong for the trial court to find that this was not a case in which it would have been reasonable, despite the discovery violation, for plaintiff to expect defendant to attempt to present testimony about either the alleged use of acrylics by Amity or

about the alleged chemical properties of such substances. Thus, it was not an abuse of discretion to conclude that plaintiff would have been unfairly prejudiced by not having had an adequate opportunity to investigate the truth of this surprise evidence.

Defendant also argues that the trial court abused its discretion by not imposing less severe sanctions, such as ordering a continuance of the trial, or granting plaintiff an opportunity to depose the excluded witnesses during a break in the trial. However, postponing the date of the trial was not an acceptable alternative in this case because plaintiff was suffering from cancer of the pancreas and was expected to live only a few more months. If plaintiff died before a postponed trial commenced, defendant would have been rewarded for its violation of the discovery rules.

Furthermore, the trial court did not abuse its discretion in concluding that "lunch-break" depositions would not have provided plaintiff with an adequate opportunity to investigate and rebut the alleged testimony of the excluded witnesses.

> "Talking to a witness during an interval in the trial cannot be regarded as a universal cure-all for interrogatory deficiencies. An interview with a witness shortly before he takes the stand is not always a satisfactory substitute for a pretrial deposition. A deposition not only permits a thorough examination under oath but also provides a provable record that can be used for impeachment purposes; it may disclose facts that should be investigated, information that should be verified, leads to other witnesses that should be pursued or aspects of the witness' background that should be checked; * * *." *Rosales v. Marquez* (1965), 55 Ill. App. 2d 203, 208, 264 N.E.2d 829.

■■ In the present case, even if there was evidence that Amity applied acrylics and not wax to the terrazzo floor, thorough chemical analysis and testing may have revealed that the alleged acrylic products were not as unslippery as their manufacturers claimed. We conclude that the trial court did not abuse its discretion in ruling that an opportunity to depose the excluded witnesses during a break in the trial would not have adequately "cured" the unfair prejudice caused by defendant's violation of the discovery rules.

■■ The evidence excluded by the trial court (*i.e.*, evidence of the products and methods allegedly used by Amity) was directly related to defendant's unreasonable refusal to reveal its knowledge of Amity's existence. The court did not abuse its discretion in concluding that the sanctions imposed were "just" under the circumstances of this case. And, because the sanctions imposed were reasonably related to defendant's misconduct in violating the supreme court discovery rules, and the deterence provided by these sanctions is a rational means of furthering

the legitimate state objective of expediting the judicial search for truth, we find no violation of defendant's right to due process of law.

## III

Next, defendant contends that the court erred in giving IPI Civil No. 5.01 because the jurors were not informed that the supposedly unfavorable evidence which defendant failed to produce consisted of testimony which was excluded by the court as a discovery sanction. Relying on this instruction, plaintiff's attorney argued that the jurors could conclude that defendant failed to produce evidence of what substances were placed on the terrazzo floor because defendant believed that this evidence would have been unfavorable to its defense.

We find that our resolution of this issue is controlled by the supreme court's decision in *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460.

Ford Motor Co., one of the defendants in *Buehler*, gave false answers to plaintiff's interrogatories, thereby secreting damaging evidence. (70 Ill. 2d 51, 67.) Plaintiff independently obtained knowledge of the withheld evidence, but the trial court refused to permit Ford to attempt to prove to the jury that the secreted evidence would not have supported plaintiff's claims. (41 Ill. App. 3d 430, 457-58.) Nevertheless, the supreme court held that it was not error to give IPI Civil No. 5.01. (70 Ill. 2d 51, 68.) This, of course, was despite the fact that the jury was not privy to the refused offer to prove that the excluded evidence was not unfavorable to Ford's defense. So, as in the present case, the jurors were not informed that the allegedly unfavorable evidence was excluded by court order.

■■ It is argued that *Buehler* is not applicable here because the defendant in that case unreasonably refused to divulge *damaging* evidence, whereas Executive House claims that the evidence withheld in this case, evidence of the existence of Amity, was favorable to the defense. But, knowledge of Amity's existence directly resulted in plaintiff's last-minute discovery of Ruth Matthews. And, as defendant stated in its post-trial motion, Matthew's testimony that wax was regularly used on the terrazzo floor was "a blow to the solar plexus of the defendant's defense theories from which defendant never recovered, nor could." In light of this admission, we find no merit in the argument that the evidence which was secreted in this case was favorable to the litigant which secreted it.

Under the holding of *Buehler v. Whalen*, the trial court did not err in giving IPI Civil No. 5.01 in this case.

## IV

Defendant also contends that the trial court erred when it refused to instruct the jurors that they could find that Amity was an independent

contractor which was solely responsible for plaintiff's injuries. IPI Civil Nos. 12.04 and 50.10.

Whether or not defendant presented enough evidence to justify giving these instructions, it is clear that the trial court considered defendant's discovery violation when it refused to give these instructions. Thus, an alternative ground for the court's ruling was its conclusion that there was a need for preventing defendant from taking advantage of its violation of the discovery rules.

If defendant had not secreted knowledge of Amity's existence, plaintiff would have had a fair opportunity to use the discovery process to fully investigate whether Amity was an agent or an independent contractor and, even if Amity was an independent contractor, whether defendant was negligent in either hiring the janitorial firm or in permitting a dangerous condition to continue to exist in the lobby of its hotel.

■■ Knowledge of the existence of Amity was peculiarly available to defendant, and the last-minute attempt to shift all liability to Amity would have permitted defendant to benefit from having secreted its knowledge of Amity. Supreme Court Rule 219(c)(iii) (73 Ill. 2d R. 219(c)(iii)) authorized the court to debar defendant from maintaining this defense, and we conclude that it would have been particularly unjust to permit defendant to avoid liability by shifting the blame to an entity whose existence defendant wrongfully secreted. We therefore conclude that the trial court did not abuse its discretion in debarring defendant from maintaining this defense.

## V

The trial court denied defendant's request for an order compelling plaintiff to comply with its "notice to produce documents" (73 Ill. 2d R.237(b)), and defendant now argues that this ruling was erroneous. However, the items listed in the "notice" could have been obtained through diligent use of the pretrial discovery process. Nevertheless, the "notice" was filed the day before trial commenced, and, despite two pretrial conferences with the court, the notice was not brought to the court's attention until plaintiff was about to call his first witness.

■■ Although it was labeled as a Rule 237(b) notice to produce documents (73 Ill. 2d R. 237(b)), it was not manifestly wrong for the court to find that the "notice" filed in this case constituted a belated attempt to obtain discovery by a litigant which had not been diligent in pursuing discovery before trial. Supreme Court Rule 201(f) states that "[T]he trial of a case shall not be delayed to permit discovery unless due diligence is shown" (73 Ill. 2d R. 201(f)), and we conclude that the trial court did not abuse its discretion by refusing to delay trial, even briefly, to consider

defendant's eleventh-hour attempt to obtain "shotgun" discovery of evidence which it could have obtained long before trial commenced.

## VI

Relying on *Hickey v. Chicago Transit Authority* (1964), 52 Ill. App. 2d 132, 139, 201 N.E.2d 742, defendant argues that it was erroneous to permit plaintiff's medical expert to testify about a diagnosis which was partially based on the expert's interpretation of X rays when the X rays were not available for use in cross-examination.

> "[A] witness who testifies orally to knowledge obtained by studying an X-ray photograph must be prepared to produce the photograph-print (and the original plates also, if desired) for cross-examination to the grounds of his interpretation." 3 Wigmore, Evidence §795, at 246 (Chadbourn rev. ed. 1970).

Nevertheless, this requirement "should not be insisted on by counsel unless in case of 'bona fide' doubt as to the witness' trustworthiness or of suspicion of fraud." 3 Wigmore, at 245.

In the present case, plaintiff's answers to defendant's interrogatories informed defendant that plaintiff claimed he suffered a spiral cominuted supracondylar fracture of the distal left femur; fracture of the knee joint; narrowing of the knee joint space; and spur formation. The interrogatory answers also put defendant on notice that X rays of the fracture had been taken. Defendant, therefore, should have known that plaintiff's medical expert would give this medical diagnosis based on his examination of the X rays. Despite this knowledge, defendant did not request production of these X rays before trial, and the X rays remained in the possession of the physician who treated plaintiff back home in Texas.

■■ Since defendant knew precisely what injuries plaintiff claimed, we are convinced that defendant would have used the pretrial discovery process to have plaintiff obtain those X rays from Texas long before trial if defendant had any suspicions of fraud or any doubts about the trustworthiness of plaintiff's physicians. In the absence of any suspicion of fraud or any *bona fide* doubt about the trustworthiness of plaintiff's medical expert, the trial court did not abuse its discretion in refusing to strike the testimony of plaintiff's medical expert even though the X rays which the expert relied upon were not available for use in cross-examination.

## VII

■■ It is also argued that, during cross-examination, the trial court refused to permit plaintiff's medical expert to refer to an X ray report which the doctor had referred to during direct examination. The portion

of the record cited to as an example of this alleged restriction shows that the trial court sustained an objection to a question which had not been completed. Although the basis for sustaining this single objection is not clear, our own study of the record reveals two other instances during the cross-examination in which defendant's attorney was permitted to use the X ray report to refresh the recollection of the expert witness. (Pp. 324, 325, plus 343 and 344.) Thus, we find no basis for concluding that the trial court refused to let the witness refer to this report during cross-examination.

## VIII

Next, defendant contends that the court erroneously excluded admissions which plaintiff made during discovery. During his deposition, plaintiff said that he thought that he had suffered some ligament damage when he injured his knee as a child. And in answering defendant's interrogatories, plaintiff swore that his childhood injury caused "some moderate instability" in his left knee.

The trial court excluded these statements on the grounds that (1) they did not impeach plaintiff's trial testimony, and (2) plaintiff was only four or five at the time of the old injury, and his answers during discovery were necessarily based on the hearsay statements of others.

■■ Plaintiff's out-of-court statements were relevant to the defense theories of the case, and they were inconsistent with the position plaintiff took during his testimony. Thus, these statements were admissions by a party opponent and were admissible as substantive evidence. *Guthrie v. Van Hyfte* (1966), 36 Ill. 2d 252, 258, 222 N.E.2d 492.

■■ The traditional and majority rule is that an admission is admissible even if the litigant did not have first-hand knowledge of the "admitted" facts. (McCormick, Evidence §263, at 632 (2d ed. 1972).) "The reason for this rule is that when a person speaks against his own interest it is to be supposed that he has made an adequate investigation." (*Waugh v. Cender* (1961), 29 Ill. App. 2d 408, 415, 173 N.E.2d 860.) The same rationale leads to the conclusion that the opinion rule is not applicable to admissions. Thus, "the prevailing view is that admissions in the form of opinions are competent." (McCormick, Evidence §264, at 632 (2d ed. 1972).) Consequently, we find that plaintiff's admissions were admissible even though they were not based on first-hand knowledge, and were in the form of an opinion.

Therefore, the pertinent question is whether the erroneous exclusion of these statements constitutes reversible error.

"It is not every error, of course, that will require a reversal. Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been

done, the judgment or decree will not be disturbed. [Citations.] But where the case is a close one on the facts, and the jury might have decided either way, any substantial error which might have tipped the scales in favor of the successful party calls for reversal." *Both v. Nelson* (1964), 31 Ill. 2d 511, 514, 202 N.E.2d 494.

■■ In the present case, defendant argues that it has been prejudiced by this error because, "The extent and effect of prior and subsequent injuries was crucial to the jury's determination of what damages Mr. Campen suffered as a result of his fall." However, plaintiff's own medical expert testified that the childhood injury caused long-term degeneration in plaintiff's left knee, and that most of plaintiff's pain was caused by this degeneration. Furthermore, the doctor testified that it was unlikely that this condition would have caused instability in the knee. In light of Dr. Kernahan's testimony, and the fact that defendant failed to present any expert medical evidence of its own, plaintiff's uneducated opinions about his prior medical condition could not have added any significant help to defendant's case. We are convinced that the error in excluding these statements did not affect the outcome of the trial, and the error is harmless.

## IX

The day before trial commenced, Dr.Kernahan had new X rays taken of plaintiff as part of a checkup. The X rays were not introduced into evidence, and the doctor did not rely on them in giving his expert testimony. But these new X rays were present in court, and defendant's attorney asked for an opportunity to have them examined by a defense expert over a weekend break in the trial.

The court denied this request, and defendant argues that this ruling deprived it of an opportunity to show that plaintiff's current and prospective pain and injuries were caused by the 1978 surgery rather than the 1975 accident.

These new X rays did not come into existence until the day before trial commenced, and defendant cannot be faulted for not having requested discovery of such evidence before trial. We conclude that defendant should have been given an opportunity to have a defense expert examine this new evidence. (See 73 Ill. 2d Rules 201(b)(1) and 214.) However, we also conclude that the error is not reversible.

First of all, the jury was informed that, in a binding judicial admission, plaintiff admitted that he had pancreatic cancer, and had a life expectancy of only a few months. Thus, any damages for prospective pain and suffering could not have been a significant portion of the jury's award.

More importantly, defendant did not act, during the pretrial discovery process, to obtain any of the other X rays which were taken of plaintiff either before or after the accident. And, it was not until the eve of trial that defendant's attorney briefly mentioned to the court a request for a medical examination of plaintiff.[2] These circumstances convince us that defendant believed that X rays of plaintiff's fracture were not important to its defense. So, although defendant now argues that it was prejudiced by the lack of an opportunity to examine the new X rays, defendant's actions in foregoing all of its pretrial opportunities to obtain X rays of plaintiff persuade us that the trial court's error did not prejudice the defense.

■■ Furthermore, plaintiff's own medical expert agreed with defendant's theory about plaintiff's current and prospective pain and injuries. Dr. Kernahan testified that (a) the 1978 surgery was bound to have some relationship with plaintiff's current pain, and (b) one of the major causes of the atrophy of plaintiff's thigh muscle was that plaintiff had not yet recovered from the 1978 surgery.

Under all these circumstances, defendant's claims of prejudice from not having had an opportunity to examine the new X rays are too remote and speculative to make the error reversible. We are convinced that there is no reasonable likelihood that the error could have affected the outcome of the trial.

Based on all of the preceding reasons, the judgment of the circuit court is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.

---

[2] There were a number of other motions made by the litigants during the pretrial conferences, along with extensive arguments, and defendant failed to remind the court, before trial, that it had not ruled on this oral motion. Nevertheless, this motion should have been made "within a reasonable time before the trial." 73 Ill. 2d R. 215(a).