CLIFTON BARNES, Plaintiff-Appellee, v. BLACK & DECKER MANUFACTURING COMPANY, Defendant-Appellant.

First District (4th Division)   No. 83—2046

Opinion filed November 29, 1984.—Modified on denial of rehearing August 29, 1985.

Wildman, Harrold, Allen & Dixon, of Chicago (Ruth E. VanDemark, Thomas J. Keevers, and Donna M. Watz, of counsel), for appellant.

Joseph R. Curcio, of Chicago (Arthur A. Sullivan, of counsel), for appellee.

JUSTICE JIGANTI delivered the opinion of the court:

On June 18, 1977, the plaintiff, Clifton Barnes, lost four fingers when he placed his hand in an electric lawn mower manufactured by the defendant, Black & Decker Manufacturing Co. Barnes charged in his product liability action against Black & Decker that the mower was defective. At the close of the evidence, the trial court struck Black & Decker's amended answer and entered a default judgment against Black & Decker on the issue of liability because the trial court believed that defense counsel had deliberately deceived the court in its production of a switch purporting to be "identical" to the type that was used on the lawn mower involved in the accident. The jury then returned a verdict of $150,000 on the issue of damages.

The trial was marked by acrimony between counsel and also between defense counsel and the court. The details of the various rela-

tionships are neither edifying, illuminating nor legally significant. The mere notation of the tenor of these relationships is sufficient to obtain the proper perspective to consider the first issue in the case at bar. On appeal, Black & Decker contends that the court erred in striking its amended answer as a sanction and that it erred in failing to give the jury instructions on the issue of comparative fault. Black & Decker further contends that there were numerous other trial errors. We believe the court was in error in striking Black & Decker's pleadings and in entering default judgment, and for that reason the cause will be reversed and remanded. We will also briefly address the issue of jury instructions regarding comparative fault. The remaining issues on trial error will probably not arise at a new trial, and consequently they will not be addressed.

The trial in this cause was scheduled to begin on September 7, 1982. On July 23, 1982, several weeks before trial, the trial court ordered Black & Decker to produce two switches; one switch "identical" to the one used in the lawn mower involved in the accident, and the second, identical to the switch on the Black & Decker lawn mower now being used. The hub of the controversy concerning the production order revolves around the production of the first switch, that is, the switch identical to the one used in the lawn mower involved in the accident. To understand the controversy, it is necessary to know the progression of the pleadings and discovery from the inception of the lawsuit until trial and also to know a little about the types of switches.

There are three different types of switches involved in this dispute. Type I switch is an "on/off" rocker switch, the switch that was on the mower used by the plaintiff. Type II switch is also an "on/off" rocker switch, but this type was designed after the plaintiff's mower was manufactured. It has the identical external features as the Type I switch, but has a different internal design. A third type of switch is referred to as a dead man's switch and is a style of switch that has replaced the rocker switch and at the time of trial was the switch currently used. This switch was produced as requested and thus is not an issue in this instant controversy.

When Barnes filed his original complaint against Black & Decker in October 1977, he alleged that Black & Decker had constructed the lawn mower "in a dangerous and unsafe manner, in that the blades thereon were not adequately shielded to prevent injury to the plaintiff *** and failed to give warning of the existence of said dangerous and unsafe condition." The complaint sounded in negligence and was completely silent with regard to the design of the switch. Thereafter, in February 1979, Black & Decker took the plaintiff's discovery deposition. The

plaintiff there testified that when he used Black & Decker's electric mower on the day of the accident he was not aware of any switch or control on the machine.

In April 1982, the plaintiff successfully petitioned for leave to file an appearance for new trial counsel and for an extension of time to complete discovery. The plaintiff then filed extensive supplemental interrogatories and requests to produce. Specifically, one of the requests to produce was the production of all written materials pertaining to the design of the "on/off" switch. In May 1982, with the lawsuit still proceeding as a negligence action, Black & Decker took the deposition of Dr. Malcolm Newman, the plaintiff's expert witness. Dr. Newman voiced eight specific criticisms of the type of Black & Decker electric lawn mower used in the plaintiff's accident. Of the eight criticisms, only two referred to characteristics of the switch and neither of those two addressed an internal characteristic of the switch. Also, the deposition of C. Lee Gough, Black & Decker's safety assurance manager, was taken. Gough testified that the lawn mower used by the plaintiff was manufactured during the 21st week of 1975, that is, approximately May 1975.

Then, sometime in June 1982, the plaintiff presented before the court a motion for leave to file an amended complaint. The amended complaint alleged that Black & Decker produced and marketed a defectively designed product. Specifically, only one of the plaintiff's allegations of design defect was particular with regard to the internal design of the switch. This allegation provided that Black & Decker "[f]ailed to equip said lawn mower with a switch that would not activate when turned to the off position." Black & Decker then submitted on July 6, 1982, a response to the plaintiff's motion. In its response, Black & Decker asserted that the plaintiff, on the eve of trial, was attempting to change the theory of the case from negligence to strict liability. On July 21, 1982, the trial court granted the plaintiff's motion. Thereafter, Black & Decker filed an answer to the amended complaint denying all allegations of design defect.

With regard to discovery, on June 2, 1982, the plaintiff filed an amended supplemental request to produce wherein he requested a switch used at the time of the accident and one that is currently being used. As the case continued through pretrial discovery, the plaintiff, on July 13, again requested from Black & Decker, this time in front of the court, the production of two switches; one "identical" to the switch that was on the mower used in the accident (Type I) and one identical to the switch used now. Plaintiff's counsel then reiterated this request, on July 20 and then again on July 21, the last time adding a certain

emphasis wherein he stated to the court, "[T]he main part of [my] motion is to produce a switch identical to the one that is now being used."

During the course of these discovery requests, defense counsel displayed a certain reluctance to comply with the plaintiff's request. Counsel continued to inform the court that he would produce the switches, but he would then proceed to suggest that the plaintiff could just as easily get the dead man switch himself. Defense counsel did however indicate that he was having difficulty maintaining contact with the people who were to supply the requested Type I switch. He further indicated that while he thought Black & Decker did manufacture the switch, it had not been used in some time and thus was not easily obtainable. However, at a later date, defense counsel informed the court that Black & Decker did not manufacture the requested switch but rather it was manufactured by Lucerne Products. Nevertheless, between June and the beginning of September 1982, pursuant to the plaintiff's production requests and a court order, Black & Decker did provide the plaintiff with numerous discovery items. Specifically, in June, Black & Decker produced the engineering design drawing for the Type I switch. Then on August 27 Black & Decker, pursuant to the July 23 order, produced two switches. Finally, in early September, Black & Decker produced the engineering design drawing for the Type II switch.

At this stage, it is critical that we momentarily depart from relating the chronology of the events so that we can expand on the above discovery productions. When Black & Decker produced the two switches, it produced a Type II switch, *i.e.*, one that appears to be identical to the one requested, not a Type I switch, *i.e.*, the identical switch requested by the plaintiff. In addition, on the face of the engineering drawings was revealed the fact that the drawing for the Type I switch was first drawn in 1969 and last drawn in April 1975, while the drawing for the Type II switch was first drawn on January 9, 1976. Based on the deposition of Gough of Black & Decker, wherein he stated that the mower in question was manufactured in approximately May 1975, it is clear that the Type II drawing was drawn after the lawn mower which injured Barnes was manufactured.

On September 7, 1982, the scheduled date for the trial, Black & Decker informed the court that the plaintiff had retained the services of new experts. As a result the trial was continued until after the depositions of the new experts. These depositions were taken on Thursday, September 23 and the trial was set for the following Monday, September 27. The new experts testified that after testing the Type II switches produced by Black & Decker and the switches on lawn

mowers previously tested by a Black & Decker expert, mowers similar to the one used by the plaintiff, they were of the opinion that the internal design of the rocker switch made the Black & Decker electric mower unreasonably dangerous. They indicated that these switches (Type II) had a false, intermediate position between the on and off positions which gave the impression that the mower was off, but which actually left the mower still activated. These depositions appear to be the first instance where Black & Decker became aware of the fact that the plaintiff was *focusing* his theory of the case on the internal design of the switch.

On September 28 the trial began. The plaintiff testified that as he was mowing the yard the mower stopped and he pushed the switch to what he thought was the off position. He put his left hand in the chute and pulled some grass out. He repeated the act, but then stated that after pulling his hand out the second time the mower started up. He then noticed that his fingers had been cut off. This testimony is significantly different from his deposition testimony, wherein he stated that he was not aware of any switch on the mower.

On September 29 and 30, the plaintiff's experts were called to testify, and their testimony mirrored that which they had given in deposition. Specifically, one of the experts, Robert Weskamp, related testimony regarding the internal design of the switch and its false, intermediate position through the use of a model he constructed from the engineering drawings provided by Black & Decker.

On October 4, the court was apprised of the fact that the actual mower involved in the accident had been located. But after extensive discussion in chambers, the court excluded the mower on the grounds that there had been no denial that the two mowers that had been previously tested by the experts and admitted into evidence were identical to Barnes' mower. Then, on October 5, during Black & Decker's case in chief, it called Gough to testify. He testified that the switch on Barnes' mower was different from the model of the switch used for illustration by plaintiff's expert, Weskamp. He based this conclusion on the fact that the mower used by Barnes was manufactured in the 21st week of 1975. Thus, the switch on Barnes' mower had to be a switch from the drawing depicting a Type I switch, since it was drawn between 1969 and April 1975, and not the switch from the drawing depicting a Type II switch which was not drawn until January 9, 1976, some seven months after Barnes' mower was manufactured. He further indicated that the switch from the drawing of the Type I switch did not have a false, intermediate position which allowed electricity to flow through it.

However, at this point, the court became concerned with the fact

that earlier as a section 60 witness, Gough testified that he had never seen the mower used by Barnes and that thus Gough could not now know that the switch on Barnes' mower was different from the one presented in court. Based on that conclusion, the court struck Gough's testimony. Black & Decker then made offers of proof by presenting the testimony of several expert witnesses that indicated that they first learned of the plaintiff's new theory, that is the energized intermediate position within the switch, shortly after the depositions of the plaintiff's three new expert witnesses. They also testified that after examining Barnes' mower, they concluded that the switch on that mower was different from the model switch used for illustrations by Weskamp.

Finally, on October 6, the plaintiff presented the court with a petition for sanctions pursuant to Supreme Court Rule 219(c) (87 Ill. 2d R. 219(c)). The motion was premised on the allegation that Black & Decker knowingly gave the plaintiff's attorney a switch which was not identical to the one on the Barnes' mower and "deliberately concealed" the "true facts" of the switch on the Barnes' mower. Thereafter, based on the general tenor of the overall trial and specifically on the court's belief that Black & Decker had deliberately concealed the facts regarding the switches, the court struck Black & Decker's amended answer and entered a default judgment against Black & Decker on the issue of liability.

■■ Supreme Court Rule 219(c) provides that the entry of sanctions, including an order striking the pleadings is permissible if a party unreasonably refuses to comply with any provision of Rules 201 through 218 or if the party fails to comply with any order entered under these rules. (87 Ill. 2d R. 219 (c)(vi).) The particular sanction imposed by the trial court rests largely within the court's broad discretion, and the exercise of such discretion will not be disturbed unless an abuse is apparent. (*Sanchez v. Phillips* (1977), 46 Ill. App. 3d 430, 361 N.E.2d 36.) However, the striking of an answer thereby causing a default is the most severe sanction a court can impose on a recalcitrant defendant, and such sanction is only proper in those cases where the actions of a party show deliberate, contumacious, or unwarranted disregard of a court's authority. *Perimeter Exhibits, Ltd. v. Glenbard Molded Binder, Inc.* (1984), 122 Ill. App. 3d 504, 461 N.E.2d 44; see also *In re Estate of Soderholm* (1984), 127 Ill. App. 3d 871, 469 N.E.2d 410.

■■ ■ The plaintiff has cited two Illinois Supreme Court cases, *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460, and *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 433 N.E.2d 253, which strongly support a trial court's use of sanctions to protect the discovery process from abuse. In *Buehler* the court stated:

"Our discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation. Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances." (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 67, 374 N.E.2d 460, 467.)

In *Ostendorf*, the court stated:

"Discovery is intended to be a mechanism for the ascertainment of truth, for the purpose of promoting either a fair settlement or a fair trial. It is not a tactical game to be used to obstruct or harass the opposing litigant." (*Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 282, 433 N.E.2d 253, 257.)

Furthermore, when a corporate agent or officer attempts to respond to discovery requests on behalf of the corporation, it is incumbent upon him to take reasonable steps to search the "corporate memory." *Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 434 N.E.2d 511.

The time frame in which the instant events occurred demonstrate that Black & Decker did not deliberately produce a different switch from the one on the Barnes' mower. In August 1982, when Black & Decker produced what purported to be the two switches requested by the plaintiff, it did not have a sufficient basis on which to believe that the internal design of the switch was the focal point of the plaintiff's case. Far more prevalent than the single allegation in the plaintiff's amended complaint with regard to the internal operation of the switch was the fact that at the time Black & Decker tendered the switches, the plaintiff had already stated in his deposition that he did not even know if the mower had a switch, and the plaintiff's sole expert witness to date had only criticized the external structure of the switch. The first indication that Black & Decker had that the internal design of the switch was a *crucial* issue to the plaintiff's case was after the depositions of the plaintiff's three new expert witnesses on September 23. Thus, by focusing on the external structure of the switch, when Black & Decker produced what was purported to be the Type I switch requested by the plaintiff, it actually presented a Type II switch that was externally identical to the Type I switch on the Barnes' mower.

It is also important to note that Black & Decker produced, along with the Type II switch, the drawing depicting both a Type I switch and the drawing depicting a Type II switch. The internal design of the switch produced was the internal design found in the drawing of the Type II switch, and that drawing was not drawn until January of 1976, seven months after the Barnes' mower was manufactured. These facts

reveal that Black & Decker produced documentation that could prove the difference in the internal design of the two switches. We believe that this tends to further undermine the notion that Black & Decker deliberately concealed the difference between the internal design of the two types of rocker switches and deliberately produced the wrong switch.

However, the plaintiff asserts that Black & Decker is still responsible for taking reasonable steps to search its corporate memory. (*Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 434 N.E.2d 511.) The plaintiff contends that through such a search Black & Decker is imputed with the knowledge at the time of the production of the switches that there are two types of rocker switches as demonstrated by the two engineering drawings, and that accordingly, Black & Decker's production of the Type II instead of a Type I switch represents a knowing violation of a court order for which the sanction imposed, the striking of Black & Decker's amended answer, was appropriate.

There is no question the instant facts reveal that Black & Decker produced the wrong switch. Black & Decker had a duty to comply with the court-ordered discovery production but failed to do so. Black & Decker was responsible for searching its corporate memory, and such a search would have revealed the difference in the internal design of the two switches. Moreover, in producing the wrong switch, Black & Decker demonstrated considerable slowness in its efforts to comply with the plaintiff's requests and the court order. Such overall conduct cannot be condoned by the courts.

However, as we stated earlier, sanctions for violations of the discovery process must be proportionate to the gravity of the violation. (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460.) Further, because the courts consider the striking of a party's pleadings the most severe sanction, such sanction is only proper in those cases where the actions of a party show a deliberate, contumacious, or unwarranted disregard for the court's authority. (*Perimeter Exhibits, Ltd. v. Glenbard Molded Binder, Inc.* (1984), 122 Ill. App. 3d 504, 461 N.E.2d 44.) In the instant case, Black & Decker failed to produce a switch identical to the one requested. Black & Decker had all the necessary information to know that there were two types of rocker switches, and its failure to use this information to produce the correct switch was indeed negligent. But, we are unable to find any actions taken by Black & Decker that can be considered deliberate, contumacious or an unwarranted disregard for the court's authority. (*Cf. In re Estate of Soderholm* (1984), 127 Ill. App. 3d 871 (Plaintiff wilfully destroyed evidence harmful to its

case).) Without evidence of the proscribed conduct, the striking of Black & Decker's pleadings was not a sanction proportionate to its violation of the discovery process. While we do not countenance discovery violations, in the instant matter, the trial court wrongfully assumed that defense counsel was deceitful and that he deliberately concealed the differences in the switches and thus it was an abuse of discretion for the trial court to impose such a severe sanction.

■ An additional issue raised on appeal by Black & Decker is the trial court's refusal to give jury instructions on the issue of comparative fault. In the plaintiff's own trial testimony, the record reveals that the plaintiff stated that he was able to unplug the mower yet did not do so, that he knew that the blades on the mower were sharp and that he knew the mower could be dangerous if it was not turned off. Black & Decker contends that these statements represent ample evidence of the plaintiff's misconduct in order to require the court to instruct the jury on comparative fault.

Meanwhile, the plaintiff argues that the conduct referred to by Black & Decker was nothing more than mere negligence or the failure to exercise ordinary care and that such conduct does not translate into elements of comparative fault in a strict liability action. *Simpson v. General Motors Corp.* (1985), 108 Ill. 2d 146, 455 N.E.2d 137.

Given the fact that the instant case is being remanded and that it is therefore not possible for this court to know what the evidence in the new trial will show, we feel that the trial court will be in a more advantageous position to apply the law as was recently stated in *Simpson* to the issue of jury instructions.

The plaintiff has requested this court, in light of Black & Decker's discovery violations, to instruct the trial court on remand to impose some sanction against Black & Decker. We believe that since we have found Black & Decker negligent in its failure to comply with discovery orders, some sanction not inconsistent with this opinion should be considered by the trial court. Therefore, based on the foregoing reasons this action is reversed and remanded for a new trial.

Reversed and remanded.

JOHNSON and LINN, JJ., concur.