(Nos. 48949, 48956 cons.—

MARIE BUEHLER *et al.*, Appellees, v. DEBRA GOOD-MAN WHALEN *et al.*, Appellants.

*Opinion filed December 12, 1977.—Opinion modified March 14, 1978.*

GOLDENHERSH, J., took no part.

Ray Freeark, of Freeark & Harvey, of Belleville, for appellant Debra Goodman Whalen.

Dunham, Boman, Leskera & Churchill, of East St. Louis (Allen D. Churchill and Francis D. Morrissey, of counsel), for appellant Ford Motor Company.

Hodson & Pennock and Crain, Hall & Cooksey, both of Centralia, and C. E. Heiligenstein, of Belleville, for appellees Marie Buehler *et al.*

MR. JUSTICE DOOLEY delivered the opinion of the court:

Plaintiffs Marie Buehler and the First National Bank of Belleville, as guardian of the estates of her sons Richard and Michael, brought suit against defendants, Debra Goodman Whalen and Ford Motor Company, to recover damages for injuries suffered when the automobile in which the Buehlers were riding caught fire after being struck by a car driven by Whalen. The other plaintiff, Gerrell Forth, was burned while helping the occupants leave the car.

The action against Whalen was predicated on negligence, while suit against Ford, the manufacturer of the Buehler car, was in strict liability in tort. It was alleged that the automobile was defectively designed.

The jury found for all plaintiffs against both defendants. Judgment was entered on the verdicts. Both defendants appealed. The appellate court affirmed. (41 Ill. App. 3d 446.) Pursuant to Rule 315 (58 Ill. 2d R. 315), we granted petitions for leave to appeal filed by both defendants.

The issues for decision are: (1) the liability of an automobile manufacturer in strict liability in tort for injuries sustained by passengers in a collision allegedly

caused by the vehicle's defective design; (2) sanctions which should be imposed for failure to comply with discovery procedures; (3) whether a joint tortfeasor is entitled to an apportionment of damages under these circumstances; and (4) the propriety of a given instruction.

The circumstances of the accident are virtually undisputed. On January 3, 1971, while the Buehler car, driven by Mr. Buehler, was traveling south on a two-lane highway headed toward the Buehler residence, Buehler had to make a left turn to enter a driveway leading to his residence on the east side of the road. When he was from 300 to 400 feet north of the driveway, he reduced his speed and turned on his left-turn signals.

The deceleration of the Buehler car caused a line of five other cars to form behind it. The last of these cars was that of defendant Whalen. She drove her car into the northbound lane to pass the line of cars ahead. As she reached a point two car lengths north of the Buehler car, she observed it was about to cross the northbound lane. Then traveling at 65 miles an hour, the posted limit, she applied her brakes and swerved to avoid hitting the Buehler car. The effort failed and the left front of her car struck the left rear of the Buehler car.

Upon impact, the rear of the Buehler car burst into flames. It came to rest on its side in a ditch bordering the side of the highway. Forth had observed the accident from his car, one of those lined up behind the Buehler car. He and others righted the car, and helped the passengers out. It was stipulated that the injuries of the plaintiffs were caused entirely by burns.

Subsequently the gas cap of the Buehler car was found near the scene. The ears securing it to the filler spout of the tank were missing. They were found within the gas tank. The filler spout had been displaced from its normal position and was extending at or below the level of the rear bumper.

Buehler's car was a 1966 Ford Fairlane sedan. It was equipped with what is called a flange-mounted gas tank, as contrasted with a strap-mounted tank. The latter model is placed below and separated from the floor of the trunk compartment. The top of the flange-mounted tank, on the other hand, serves as the floor of the trunk. The tank is held rigidly to the car structure by screws. The gas filler spout runs through the trunk into an opening in the license plate bracket area above the rear bumper. The distance between tank and bumper is about 2½ inches.

The flange-mounted tank was not used in any American automobile prior to 1960. In that year Ford started using it in some models. General Motors and Chrysler continued to use the strap-mounted tank in their cars. Sometime after 1970 Ford changed back to that model.

The 1966 Fairlane had no shielding between the trunk compartment and the passenger compartment other than a fiberboard panel and the padding of the rear seat.

Expert testimony made it apparent that the fire in the Buehler car arose out of its being struck by Whalen's car, and that the occurrence of the fire in the trunk, as well as its rapid spread into the passenger compartment, was due to the design of the Fairlane model.

Paul O'Shea, head of a company called California Automotive Research, which does work in automotive design and testing, testified on the basis of his inspection of the Buehler car and of a crash test that the impact on the Buehler car, at an estimated impact velocity of 35 miles an hour, knocked the tank cap off.

William Eddie, chief engineer at St. Louis Testing Laboratory, was of the opinion that the impact of the collision caused a sudden change in the configuration of the tank and a surge of its contents which in turn forced off the cap.

Derwyn Severy is a research engineer in the Department of Transportation and Traffic Engineering at the

College of Engineering at the University of Southern California who has done considerable research into automobile crashes, including test crashes as well as some 6,000 actual crashes. He has also done studies on fires occurring after collision between cars. He stated that the abrupt acceleration of the Buehler car as a result of the collision caused the gasoline in the tank to surge to the rear of the tank, forcing off the cap, and introducing atomized gas into the trunk. This gas was then ignited by sparks generated in the collision by contact between the metal of the car and the pavement.

Both O'Shea and Severy testified that if the car had had a firewall between the trunk and the passenger compartment, the spread of the fire would have been delayed long enough to permit the occupants to get out without suffering serious injury.

According to Severy, the design of the Fairlane rendered it susceptible to fire originating in the gas tank upon a rear-end collision for several reasons. There was the close proximity of the tank to the rear bumper, making likely the release of the contents of the tank in a rear-end impact. Another was that the rigid method by which the tank was attached to the car made the tank particularly subject to stress from the impact, with the result that the tank would be warped and the filler neck displaced from its normal position. The lack of a fire wall, the use of which he had recommended to the automotive industry, including Ford, was a contributing fact. Severy concluded that the design of the fuel tank in the 1966 Ford Fairlane constituted an unreasonably dangerous condition for occupants of the vehicle.

The probability of rear-end accidents was established by the testimony. O'Shea stated that 50% of all automobile collisions were of that type. The percentage of rear-end collisions resulting in fires was also in evidence. O'Shea estimated a figure of one-half of one percent,

whereas Severy stated that more recent data indicated the figure was 4%. Severy also testified, however, that in about 12% of collisions where gas spillage occurs, the gas ignites.

Ford contends it had no duty to design a vehicle that would prevent injuries to plaintiffs under the occurrences of this case. Ford argues that while the injury complained of may have been foreseeable, it was not one which it was "objectively reasonable to expect." It relies on *Mieher v. Brown* (1973), 54 Ill. 2d 539, and *Cunis v. Brennan* (1974), 56 Ill. 2d 372.

In *Mieher* a car driven by decedent collided with the rear of a truck manufactured by International Harvester Company. Decedent's car was propelled underneath the bed of the truck. Plaintiff's negligence action was based on alleged negligence in the design of the truck, since there was no bumper or shield to prevent a car from passing underneath its body in the event of a collision. *Mieher,* involving the duties of the manufacturer of a vehicle to a nonuser, described the issue as whether the manufacturer's duty was to "design a vehicle with which it is safe to collide." (54 Ill. 2d 539, 543.) The manufacturer's duty, this court concluded, did not extend to this "highly extraordinary" occurrence. (54 Ill. 2d 539, 545.) Actually, it would seem that the question is far broader. Does the manufacturer have a duty to so design a vehicle as to avoid unreasonable risk of injury in the event of collision regardless of whether the injured is within or without the automobile?

Incisively in point is *Nanda v. Ford Motor Co.* (1974), 509 F.2d 213, a decision by the Seventh Circuit Court of Appeals applying Illinois law, and involving what appears to be the same design defect as the one in the present case. Plaintiff was driving a 1967 Ford Cortina. He had stopped in the northbound lane of a highway preparatory to making a left turn. He was struck in the rear by another vehicle traveling about 10 miles per hour, and his car was

pushed into the southbound lane, where it was hit by a third vehicle. There was evidence from which the jury could have found that the first collision caused a small fire in the rear of plaintiff's car. The fire then increased in size upon the second collision, engulfing the car in flames and seriously burning plaintiff.

Plaintiff's action was based on design defects in the gas tank. As here, the top of the tank also served as part of the floor of the trunk, and there was no shielding between the trunk and the passenger compartment except for a piece of cardboard. In addition, expert testimony showed that the filler neck of the tank tended to be displaced into the tank, and that the tank neck and cap were extremely vulnerable to impact.

The court of appeals affirmed a judgment for plaintiff. After reviewing the decisions of this court in *Mieher* and *Cunis,* the court concluded:

"Application of the principles stated in the *Mieher* and *Cunis* opinions requires affirmance here. Viewing the evidence in the light most favorable to the plaintiff, it does not appear to us to be 'highly extraordinary' that the absence of a firewall or shield between the fuel tank and the passenger compartment and the condition of the filler-pipe assembly would bring about the harm for which plaintiff sues. The jury could have found that those conditions, in the words of the *Mieher* opinion, constituted an 'unreasonable danger' and subjected the user of the product to 'an unreasonable risk of injury.' A rear-end collision is the most common of highway mishaps, and it is not 'extraordinary,' 'bizarre,' 'unique,' or 'freakish and *** fantastic' for such a collision to impel the victim vehicle into a collision with a third vehicle." 509 F.2d 213, 218.

There is a series of decisions imposing liability for escape of gasoline and consequent fires after a rear-end collision involving cars with similar fuel tank installations. (*Self v. General Motors Corp.* (1974), 42 Cal. App. 3d 1, 116 Cal. Rptr. 575; *Grundmanis v. British Motor Corp.* (E.D. Wis. 1970), 308 F. Supp. 303; *Johnson v. American Motors Corp.* (N.D. 1974), 225 N.W.2d 57; *Polk v. Ford Motor Co.* (8th Cir. 1976), 529 F.2d 259; *Turcotte v. Ford Motor Co.* (1st Cir. 1974), 494 F.2d 173.) These cases illustrate what is shown by the evidence in the present case, namely, that cars equipped with a fuel system of the type used on the Fairlane represent a design defect because of the vulnerability of the tank to impact and the risk of fire spreading into the passenger compartment. Given the frequency of rear-end collisions we cannot say that the injuries here were not objectively reasonable for the manufacturer to anticipate.

Probably the first case to adopt the position that the manufacturer is liable for defects which enhance the injuries received in an accident is *Larsen v. General Motors Corp.* (8th Cir. 1968), 391 F.2d 495. The design defect in *Larsen* was in the steering assembly, which caused the wheel to be displaced rearward in a head-on collision, striking plaintiff in the head. The trial court had granted a summary judgment for defendant relying on the decision of the Seventh Circuit in *Evans v. General Motors Corp.* (1966), 359 F.2d 822, that the manufacturer has no duty to design a car that will be accident-proof, and that participation in a head-on collision is not an intended use of the car.

The Eighth Circuit disagreed. It stated:

"Automobiles are made for use on the roads and highways in transporting persons and cargo to and from various points. This intended use cannot be carried out without encountering in varying degrees the statistically proved hazard of injury-

producing impacts of various types. The manufacturer should not be heard to say that it does not intend its product to be involved in any accident when it can easily foresee and when it knows that the probability over the life of its product is high, that it will be involved in some type of injury-producing accident." 391 F.2d 495, 501-02.

The views expressed in *Larsen* find support in Prosser, Torts 644-46 (4th ed. 1971), and 2 Restatement (Second) of Torts secs. 398, 435 (1965), which states:

"Sec. 398. Chattel Made Under Dangerous Plan or Design

A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."

"Sec. 435. Foreseeability of Harm or Manner of Its Occurrence

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

Succinctly stated, under *Larsen* the manufacturer's duty is to use reasonable care in the design and manufacture of its product, bearing in mind that the intended and actual use of automobiles results in collisions. The cases adopting *Larsen's* position are legion. (*Knippen v. Ford Motor Co.* (D.C. Cir. 1976), 546 F.2d 993; *Ford Motor Co. v. Evancho* (Fla. 1976), 327 So. 2d 201;

*Passwaters v. General Motors Corp.* (8th Cir. 1972), 454 F.2d 1270 (applying Iowa law); *Garst v. General Motors Corp.* (1971), 207 Kan. 2, 484 P.2d 47; *Volkswagen of America, Inc. v. Young* (1974), 272 Md. 201, 321 A.2d 737; *Frericks v. General Motors Corp.* (1976), 278 Md. 304, 363 A.2d 460 (applying North Carolina law); *Rutherford v. Chrysler Motors Corp.* (1975), 60 Mich. App. 392, 231 N.W.2d 413; *Perez v. Ford Motor Co.* (5th Cir. 1974), 497 F.2d 82 (applying Louisiana law); *Polk v. Ford Motor Corp.* (8th Cir. 1976), 529 F.2d 259 (applying Missouri law); *Brandenberger v. Toyota Motor Sales, U.S.A., Inc.* (1973), 162 Mont. 506, 513 P.2d 268; *Friedrich v. Anderson* (1974), 191 Neb. 724, 217 N.W.2d 831; *Bolm v. Triumph Corp.* (1973), 33 N.Y.2d 151, 305 N.E.2d 769, 350 N.Y.S.2d 644; *Johnson v. American Motors Corp.* (N.D. 1974), 225 N.W.2d 57; *McMullen v. Volkswagen of America* (1976), 274 Ore. 83, 545 P.2d 117; *Dyson v. General Motors Corp.* (E.D. Pa. 1969), 298 F. Supp. 1064 (applying Pennsylvania law); *Mickle v. Blackmon* (1969), 252 S.C. 202, 166 S.E.2d 173; *Engberg v. Ford Motor Co.* (1973), 87 S.D. 196, 205 N.W.2d 104; *Dreisonstok v. Volkswagenwerk, A.G.* (4th Cir. 1974), 489 F.2d 1066 (applying Virginia law); *Baumgardner v. American Motors Corp.* (1974), 83 Wash. 2d 751, 522 P.2d 829; *Arbet v. Gussarson* (1975), 66 Wis. 2d 551, 225 N.W.2d 431.) Each of the foregoing is predicated on negligence, and many on both negligence and the wholly dissimilar strict liability in tort doctrine.

In *Lewis v. Stran Steel Corp.* (1974), 57 Ill. 2d 94, an action in negligence as well as strict liability, this court held the defendant manufacturer responsible to a bystander. When its product was transported by a purchaser's employee on the purchaser's premises on a fork lift truck, the wheel of the fork lift went into a hole in the floor and caused sheets of flooring to fall and strike plaintiff, a bystander.

In the appeal by defendant Whalen she objects to the refusal of the trial court to instruct the jury to "apportion" damages by assessing all of them against Ford and none against her. This request was based on the fact that the only injuries to plaintiffs consisted of burns resulting from the fire within the car.

What defendant Whalen would overlook is her obviously negligent driving which caused the collision, the precipitating cause of the fire. We have here a classic case of concurrent tortfeasors whose separate acts combine to produce a single individual injury. Under these circumstances there is no apportionment. Prosser, Torts, sec. 52, at 315-16 (4th ed. 1971); Restatement (Second) of Torts sec. 433A, comment *i*.

*Gertz v. Campbell* (1973), 55 Ill. 2d 84, on which Whalen relies, is not apposite. There plaintiff's leg was injured when he was hit by defendant's car. Following the accident plaintiff consulted a doctor. Although examination showed that immediate surgery was required, the treating doctor negligently delayed performance of the surgery for 17 hours, with the result that amputation became necessary. Under *Chicago City Ry. Co. v. Saxby* (1904), 213 Ill. 274, defendant was liable not only for those injuries immediately arising out of the collision, but also for the additional injuries attributable to the doctor's negligence. When plaintiff brought suit against defendant, the latter accordingly filed a third-party complaint against the doctor seeking indemnification for such damages as defendant might be required to pay which arose out of the third-party defendant's negligence. The court held that the third-party complaint stated a cause of action for what the appellate court had described as an "equitable apportionment" and what two judges, specially concurring, described as a form of subrogation. 55 Ill. 2d 84, 86, 94.

Here, however, Whalen filed no third-party action. Had she done so, her own active negligence would have

prohibited any claim of indemnity from Ford. In effect, she would now escape responsibility for injuries caused in part by her negligence. It is settled, however, that each of two concurrent tortfeasors may be held liable for the total damages incurred. See *Carver v. Grossman* (1973), 55 Ill. 2d 507, 511; *Reese v. Chicago, Burlington & Quincy R.R. Co.* (1973), 55 Ill. 2d 356, 363; *Miller v. DeWitt* (1967), 37 Ill. 2d 273, 289; *Chicago & Illinois Midland Ry. Co. v. Evans Construction Co.* (1965), 32 Ill. 2d 600, 603.

We are aware of *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, filed this day. However, *Skinner's* applicability is prospective only, covering occurrences arising on and after March 1, 1978. Accordingly, this litigation remains unaffected.

Whalen asserts error in the refusal of the trial court to grant her motion to strike the pleadings of Ford and enter a default judgment against it. That motion was based on the failure of Ford to comply with discovery mandated by our rules.

On July 8, 1971, an order was entered against Ford directing it to produce all reports relative to the litigation. On May 26, 1972, prior to trial, plaintiffs submitted the following interrogatory to Ford:

> "Please list all tests performed, of every nature and description whatsoever, and whether performed by the defendant or not, along with results and analyses and interpretations thereof, which were made on the 1966 Ford Fairlane 500 or any Ford preceding it if it was not dissimilar, in which the automobile was subjected to any form of impact collision, upset, fire or other force of any sort whatsoever, or in which the tank or gas was subjected to such force or pressure, and giving the following information:
>
> (a) Where and when performed;
> (b) By whom performed and for whom;
> (c) Nature of the tests;
> (d) Results of the tests;
> (e) Analyses of the tests;

(f)  Interpretations of the tests."

Ford's answer under oath was "None."

Subsequent to the filing of this answer, on October 5, 1972, Gilford Gorker, an engineer employed by Ford, testified in a discovery deposition that Ford had conducted tests of rear-end-collision impacts on cars having flange-mounted tanks. Plaintiffs' counsel thereupon requested the test reports. Some were front-end-impact and rear-end-impact tests. But no rear-end tests conducted at speeds greater than 21.4 miles per hour were furnished. Some of these were supplied in December 1972. A second set of test reports was supplied one day before trial.

Other interrogatories submitted to Ford asked whether any employee of Ford or of a subsidiary had ever submitted a report or opinion recommending against the use of a fuel system like that used on the 1966 Fairlane, or any warning of any hazards in its use. To these interrogatories Ford answered that to its knowledge it had not received any such report.

On June 13, 1973, plaintiffs filed a motion to admit facts and documents. The answer of Ford admitted that Ian Tampen, a research engineer at Ford Motor Company, Ltd. (a British subsidiary), had been investigating accidents involving Ford products since August of 1966. Ford's response also admitted that on October 16, 1969, Tampen had prepared a document reading as follows:

> "A similar case [of a rear-end collision resulting in fire] occurred recently in U.S.A. The Cortina tank burst and caused an immediate conflagration. No further details are available, however it does indicate that the floor mounted tank is hazardous and should be carefully reviewed and tested in each new model."

The Cortina also employed a flange-mounted tank.

Tampen described the flange-mounted tank as "hazardous" following his investigation of the rear-end collision and fire involving a Ford Cortina. Ford, notwithstanding

that the interrogatories embraced "its subsidiaries," when confronted with this document in the motion to admit, sought to pass off "this matter as a finding of an employee of Ford Motor Corporation, Ltd."

On the trial of this cause Gilford Gorker, a "house expert" for the Ford Motor Corporation, denied there had been conducted "any 30 m.p.h. rear end impact tests of Ford Fairlanes and Ford Mustangs with a similar tank arrangement." On cross-examination by Whalen's counsel Gorker was confronted with a record of the tests of Ford Motor Corporation up to 1959. This exhibit, amongst others, embraced test No. 253, wherein a 1966 Ford Fairlane was rear ended at 30 m.p.h. After this impact the fuel tank was deformed causing the tank to leak fuel. Another test, No. 301, on a Mustang at 30 m.p.h. resulted in 26 inches of structural collapse and a leaking gas tank.

This was vital information which had been withheld by defendant Ford Motor Corporation. Whalen's attorney had obtained this Ford record from some litigation other than the instant one—a sad commentary on the effectiveness of the discovery here.

Whalen made a motion in the trial court to strike Ford's pleadings and enter a default judgment against it because of Ford's false answer to the interrogatory concerning crash tests, and failure to provide her with the records requested. In lieu of this sanction authorized under Rule 219(c) (58 Ill. 2d R. 219(c)), the trial court held a hearing for the purpose of determining whether Ford should be held in contempt. The trial court's memorandum of opinion included the following:

> "The court feels, however, that Ford Motor Co. did withhold evidence it could have easily discovered and then made available to the other parties. The court has found the defendant Ford not guilty of contempt only because of the technical language of the various requests made to Ford to produce certain information."

We find no "technical language" in the requested discovery. And we cannot condemn too severely the conduct of the Ford Motor Corporation in the discovery procedures here. It gave false answers to interrogatories under oath. It secreted evidence damaging to its case. Under the circumstances, the trial court would have been justified in striking the answer of this defendant and submitting to the jury only the issue of damages.

Our discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation. Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances. These are already in Rule 219(c). It provides for varied sanctions, including contempt proceedings. But a contempt procedure is hardly a sanction in reality. The order can, of course, be appealed. The worst penalty is the payment of a nominal fine. Meanwhile, the opposing party may well have been forced to trial without truth, and truth is the heart of all discovery.

Disclosure is the object of all our discovery procedures. It is the opinion of this court that trial courts should make disclosure a reality. Here discovery has long since been completed. Had the jury here found in favor of Ford, a civil contempt adjudication would have given little satisfaction to plaintiffs. As a minimum, it would have been proper to grant plaintiffs a new trial solely on the issue of damages. And even that relief, with the time and money involved, is pragmatically inadequate. Here, of course, judgment was entered in favor of plaintiffs. Under these circumstances we think that denial of Whalen's motion for a new trial lay within the discretion of the trial court.

We note that the record shows house counsel of Ford was responsible for providing Ford's trial counsel with the materials requested in discovery procedures. On the oral

argument of this cause all parties to this suit were careful to disclaim any wrongdoing on the part of Ford's trial counsel, who enjoys a reputation as an honorable practitioner. However, attorneys who wish to conduct the practice of law on a long-distance basis should advise their clients that Illinois courts will not tolerate fractional discovery or fractional disclosure.

Defendant Ford also complains of instructing the jury to the effect that unfavorable inferences could be drawn because of failure to produce documents. (Illinois Pattern Jury Instruction, Civil, No. 5.01 (2d ed. 1971).) It was Ford's conduct which brought about the giving of this instruction. Under the circumstances of this case it was justified.

The judgment is accordingly affirmed.

*Judgment affirmed.*

MR. JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.