NOTICE
Decision filed 12/08/17. The text of this decision may be changed or corrected prior to the filing of a Petiion for Rehearing or the disposition of the same.

2017 IL App (5th) 160478

NO. 5-16-0478

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| JUDITH K. SIMPKINS and ROBERT L. SIMPKINS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 13-L-183 |
| | ) | |
| HSHS MEDICAL GROUP, INC., d/b/a Southern | ) | |
| Illinois Brain and Spine Center; | ) | |
| NICHOLAS E. POULOS, M.D.; HOSPITAL SISTERS | ) | |
| HEALTH SYSTEM; and ST. ELIZABETH'S | ) | |
| HOSPITAL OF THE HOSPITAL SISTERS OF | ) | |
| THE THIRD ORDER OF ST. FRANCIS, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (St. Elizabeth's Hospital of the Hospital Sisters of | ) | Vincent J. Lopinot, |
| the Third Order of St. Francis, Defendant-Appellee). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Justice Chapman concurred in the judgment and opinion.
Justice Goldenhersh concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1    The plaintiffs, Judith K. Simpkins and Robert L. Simpkins, appeal an order of the circuit court dismissing count IV of the first amended complaint against defendant, St. Elizabeth's Hospital of the Hospital Sisters of the Third Order of St. Francis (Hospital), on grounds that the allegations were time-barred. On appeal, the plaintiffs contend that the allegations in count IV of the amended complaint relate back to the original complaint and are not time-barred and,

1

alternatively, that count IV was timely filed prior to the expiration of the statute of repose and within two years of discovering the negligence of the Hospital's staff. For reasons that follow, we reverse the circuit court's order dismissing count IV of the first amended complaint and remand the cause for further proceedings.

¶ 2                                    FACTUAL BACKGROUND

¶ 3      In January 2010, plaintiff Judith Simpkins consulted defendant Nicholas E. Poulos, M.D., because of low back pain and pain in the left buttock, thigh, and calf. Dr. Poulos, a neurosurgeon, evaluated Judith's condition, diagnosed left lumbar radiculopathy secondary to multilevel spinal stenosis, and recommended a lumbar laminectomy. In February 2010, Dr. Poulos performed a lumbar laminectomy at vertebral levels L3 through L5. The office notes for Dr. Poulos indicate that the procedure provided relief for about four months. Subsequently, Judith began to experience pain in her right buttock, radiating into the thigh and calf. She returned to Dr. Poulos for an evaluation of these symptoms. Dr. Poulos recommended a series of transforaminal blocks and epidural injections, but these therapies provided only temporary relief. Because Judith's symptoms persisted, Dr. Poulos recommended additional surgery.

¶ 4      On January 26, 2011, Dr. Poulos performed an anterior lumbar spinal fusion surgery. The surgical procedure was performed at the Hospital in Belleville, Illinois. During the procedure, Dr. Poulos affixed two Medtronic plates to stabilize the fusions at the L4-L5 and the L5-S1 vertebrae. Postoperatively, Judith suffered significant medical complications and was transferred to a rehabilitation facility for further care. Subsequently, she developed an abdominal wound dehiscence and an infection, requiring an additional hospital stay. She was discharged home on March 2, 2011. On April 11, 2011, Judith had follow-up X-rays of the lower lumbar spine. The X-rays showed the Medtronic plate at L5-S1 was well positioned and the Medtronic plate at L4-

2

L5 had pulled about 10 millimeters off of the spine. After reviewing the X-rays, Dr. Poulos decided to schedule Judith for follow-up X-rays and an imaging scan to further define the vascular anatomy and determine whether there was any additional movement of the displaced plate. Although Judith was not reporting any physical symptoms, there was concern about the potential for vascular compromise because the displaced plate was in close proximity to the inferior vena cava and the aorta.

¶ 5 Approximately two weeks later, Judith had follow-up X-rays and an abdominal computerized tomography (CT) scan. The CT scan, performed on April 21, 2011, indicated that the displaced plate had not migrated further but that it was causing the distal abdominal aorta to bow. The CT also showed that the displaced plate was touching, but not displacing, the vena cava. Dr. Poulos met with the plaintiffs on April 27, 2011. During that visit, Dr. Poulos recommended a semi-elective revision surgery to remove the displaced plate and to affix pedicle screws to stabilize the fusion. Dr. Poulos indicated that without the surgery, over time, Judith would be "at risk for erosion of her aorta and a potentially catastrophic hemorrhage." With Judith's consent, Dr. Poulos planned to schedule the surgery within the next two weeks. On May 9, 2011, the plaintiffs made an unscheduled visit to Dr. Poulos's office. According to the office notes, Judith reported that she was anxious about the surgery. Dr. Poulos reviewed the procedure with the plaintiffs, including its risks and benefits.

¶ 6 On May 13, 2011, Dr. Poulos performed the revision surgery at the Hospital. In the operative note, Dr. Poulos observed there was "no evident arterial or venous injury." Following the surgery, Judith was placed in the intensive care unit (ICU). According to the Hospital record, at 4:30 p.m., Dr. Poulos left a written order directing the nurses to perform a vascular assessment every two hours. According to the order, a Doppler check of the dorsalis pedal pulses was to be

3

performed as part of each vascular assessment. The ICU records indicate that within a few hours after the surgery, Judith began to complain of numbness in her left foot. According to the ICU records, Beth Stewart, an ICU nurse who cared for Judith during the evening shift, conducted neurological assessments at 5 p.m. and 6 p.m. Stewart documented Judith's complaints of numbness of her left foot. Stewart noted that Judith was able to move both feet, and that the neurological check was positive for Doppler pedal pulses. As a part of her documentation, Stewart also noted that she informed Dr. Poulos of her findings.

¶ 7    At approximately 8 p.m. on May 13, 2011, another ICU nurse, Cynthia Kovach, began to care for Judith. According to the ICU records, Kovach performed a neurological check at 8 p.m. Kovach observed that Judith had tingling in both feet, that sensation was intact, that she could move all of her extremities, and that her legs were weaker. At 10:47 p.m., Kovach observed that Judith had tingling and numbness below the knees in both of her legs, and that these symptoms were greater on the right leg. Kovach noted that Judith was able to feel touch and pinch sensations in both legs but that sensations had diminished. At approximately 1 a.m., Kovach observed diminished sensations in Judith's feet. At 2:11 a.m., Kovach noted a further diminution of sensation in both of Judith's feet and a weak plantar push on the right. She also documented Judith's complaints that her legs were feeling heavy and tingling was present below her left knee to her foot. To the extent we can interpret the records, there appears to be no indication that Kovach assessed Judith's pedal pulses with a Doppler device during the period from 8 p.m. until 4 a.m. and no indication that Kovach notified Dr. Poulos of Judith's changing condition during that time frame.

¶ 8    At 4:20 a.m., on May 14, 2011, the Hospital records appear to indicate that Dr. Poulos spoke with Kovach and ordered a stat CT of Judith's lumbar spine. It is unclear whether Dr.

4

Poulos called the ICU, or whether someone from the ICU contacted Dr. Poulos. In the next nursing assessment at 5:27 a.m., Kovach recorded absent sensation in Judith's right foot and continued tingling below the left knee to her foot. Kovach also noted that the Doppler showed Judith's pedal pulses were weak, with the right side weaker than the left. Kovach documented that Judith complained of pain in both legs and lower back, that Judith's legs felt heavy, and that Judith could move her legs only very slowly. At 5:40 a.m., Dr. Poulos contacted the ICU, issued an order to page Dr. Finlay, a vascular surgeon, and asked him to call Dr. Poulos at home. At 5:45 a.m., Dr. Finlay called the ICU with an orders to obtain consents and prepare Judith for surgery.

¶ 9    When Dr. Finlay arrived at the hospital, he evaluated Judith and ordered an arterial Doppler imaging assessment. Dr. Finlay observed that Judith had poor blood flow and decreased sensations in both legs. He diagnosed bilateral lower extremity (BLE) ischemia with aortic occlusion. He recommended an emergent aorto-bilateral lower extremity thromboembolectomy to attempt to restore blood flow to the vessels in Judith's legs and to determine what was causing the occlusion. Dr. Poulos also came to the Hospital and evaluated Judith. He suspected ischemia, secondary to an aortic thrombus.

¶ 10    At 8 a.m. on May 14, 2011, Julie Denton, presumably the day-shift ICU nurse, conducted a vascular assessment and charted that sensation to both of Judith's feet was "absent." Judith was evaluated by a physician on the hospitalist service at 8:40 a.m. Shortly after that evaluation, Judith was taken to the operating room. She underwent emergency surgery, performed by Dr. Finlay. According to Dr. Finlay's operative report, Judith had developed bilateral lower extremity ischemia and an aortoiliac dissection with complete occlusion of the aorta. Additionally, there was complete occlusion of the common iliac arteries, bilaterally, with distal

5

thrombus. Dr. Finlay performed an aortoiliofemoral thromboembolectomy bilaterally, a stent graft repair, and an aortobiiliac dissection. Postoperatively, Dr. Finlay noted that Judith was to be observed for development of compartment syndrome because the surgical procedure lasted approximately 4 hours and 20 minutes, and there was concern that reperfusion of the blood vessels could result in swelling of the tissues in Judith's legs. Judith remained hospitalized until May 25, 2011. She was then transferred to a rehabilitation unit for further treatment.

¶ 11                          PROCEDURAL HISTORY

¶ 12    On April 5, 2013, the plaintiffs filed an action in the circuit court of St. Clair County alleging counts sounding in medical negligence against Dr. Poulos, HSHS Medical Group, Inc. (HSHS Medical Group), Hospital Sisters Health System, and the Hospital. The plaintiffs also named Medtronic, Inc., and another physician as respondents in discovery. In the complaint, the plaintiffs alleged that in April 2011, Dr. Poulos became aware that the Medtronic plate at L4-L5 was displaced and that Judith's aorta was tented over that plate. The plaintiffs further alleged that Dr. Poulos was negligent in, among other things, failing to recommend emergency surgery to remove the plate after learning that it was displaced and that delaying the revision surgery until May 13, 2011, caused a deterioration of the aorta, resulting in the aortoiliac dissection, with complete occlusion of the aorta, thus requiring the emergent vascular surgery on May 14, 2011. The plaintiffs claimed that Judith suffered ischemia and permanent nerve damage in the lower extremities as a direct and proximate result of the negligence. The plaintiffs asserted that defendant HSHS Medical Group was liable as the employer or principal of Dr. Poulos and that defendant Hospital was liable as the employer, principal, or partner of Dr. Poulos.

¶ 13    Attached to the complaint, the plaintiffs filed a section 2-622 affidavit (735 ILCS 5/2-622 (West 2012)) and the report of their consulting physician. According to the report, the consulting

physician had reviewed the medical records from the Hospital and Dr. Poulos and opined that the care rendered by Dr. Poulos was below the standard of care "in that, among others, he failed to remove the Medtronic plate in an emergent manner upon learning that it had pulled out and was compressing and angulating the aorta." The consulting physician further opined that the delayed surgery caused vessel injury and thrombosis, resulting in permanent nerve damage in Judith's legs.

¶ 14    Defendants Poulos and HSHS Medical Group filed answers and denied that they were negligent in any of the ways claimed in the complaint. The Hospital also filed an answer and denied the allegations of negligence against it. Additionally, the Hospital generally replied to the allegations in each count directed against Poulos and HSHS Medical Group. The Hospital stated that it "makes no answer *** since the count is not directed to this defendant," but if any of the allegations in the count "are deemed applicable" to the defendant, Hospital, "same are expressly denied." The Hospital filed affirmative defenses, claiming that the alleged damages were caused by the negligence of persons other than it, that the plaintiffs failed to mitigate their damages, and that the plaintiffs were contributorily negligent.

¶ 15    During the next several months, the parties engaged in written discovery. The discovery deposition of Dr. Poulos was taken on March 28, 2014. According to excerpts from that deposition, Dr. Poulos testified that Judith was being monitored and assessed by the nurses in the ICU after the revision surgery on May 13, 2011, and that he was not notified of Judith's downward trend until approximately 4 a.m. on May 14, 2011. Following the deposition of Dr. Poulos, plaintiffs' counsel requested the depositions of all ICU nurses who cared for Judith on May 13, 2011, and May 14, 2011.

7

¶ 16    After several months of delay and cancelled deposition dates, the plaintiffs secured a deposition date for Cynthia Kovach on April 24, 2015. This was more than one year after the deposition of Dr. Poulos. According to excerpts from Kovach's deposition, Kovach testified that she could not recall if she contacted Dr. Poulos about the changes she noted in Judith's condition following the neurological assessments conducted during the late evening hours on May 13, 2011. Kovach did testify, however, that she called Dr. Poulos at 4:20 a.m. on May 14, 2011, because of changes she noted in Judith's condition at 2:11 a.m. that morning.

¶ 17    On May 5, 2015, the plaintiffs filed a motion for leave to file their first amended complaint to conform with the evidence gathered in discovery. On May 26, 2015, the trial court granted the plaintiffs leave to file their first amended complaint. There is no indication that any defendant objected to the plaintiffs' motion to amend.

¶ 18    In the first amended complaint, the plaintiffs alleged that in April 2011, Dr. Poulos became aware that the Medtronic plate at L4-L5 was displaced and that Judith's aorta was tented over that plate. The plaintiffs further alleged that Dr. Poulos was negligent in "failing to recommend emergency surgery upon learning that the Medtronic plate was not properly attached and then failing to request a vascular consultation soon after the May 13, 2011 revision surgery." The plaintiffs also alleged that the HSHS Medical Group was liable as the agent and employer of Dr. Poulos.

¶ 19    In count IV of the first amended complaint, the plaintiffs alleged that the Hospital personnel, including doctors, nurses, attendants, and others, provided care to Judith in the ICU after the May 13, 2011, revision surgery and that the Hospital personnel were negligent in "either failing to adequately assess, monitor, document, and/or report the condition of Plaintiff Judith K. Simpkins and/or failing to request a vascular consultation sooner after the May 13, 2011 revision

8

surgery." The plaintiffs alleged that Judith's condition continued to deteriorate following the revision surgery and that the continued failure to recognize the neurovascular deterioration resulted in aorta vessel damage, resulting in an aortoiliac dissection, with complete occlusion of the aorta, requiring an emergent vascular surgery on May 14, 2011. The plaintiff also alleged that as a direct and proximate result of the negligence, Judith developed ischemia, resulting in permanent nerve damage in her lower extremities.

¶ 20    Attached to the first amended complaint was the requisite section 2-622 affidavit, the report from the consulting physician, and a new report from a consulting registered nurse. The nursing consultant opined that Cynthia Kovach failed to follow the appropriate standard of care, in that she failed to assess and document Judith's vascular condition following the revision surgery, failed to follow the doctor's orders for a Doppler examination every two hours, failed to document any assessments between 2:11 a.m. and 5:27 a.m. on May 14, 2011, and failed to recognize and communicate Judith's worsening neurological and vascular status prior to 4:20 a.m.

¶ 21    On June 18, 2015, the Hospital filed a motion to dismiss the allegations in count IV of the first amended complaint, with prejudice, that were directed against the ICU nurses. In its motion, the Hospital asserted that the allegations constituted new and independent claims against one of its ICU nurses, that the allegations did not relate back to the plaintiffs' original complaint, and that the allegations were barred by the statute of limitations and the statute of repose. The plaintiffs filed a memorandum in opposition to the Hospital's motion to dismiss. The plaintiffs claimed that the complaint and the first amended complaint dealt with the medical care provided to Judith from May 13, 2011, through May 14, 2011, and that the allegations in the first amended complaint related back to the original complaint. The plaintiffs further claimed that the Hospital

was on notice of the allegations in count IV of the amended complaint, noting that the plaintiffs' discovery requests were directed toward the time period and events that Dr. Poulos had discussed during his discovery deposition and that thereafter the plaintiff requested dates for depositions of the ICU nurses who had cared for Judith during that time period.

¶ 22    Following a hearing, and after considering the oral and written arguments of counsel, the trial court issued an order on September 16, 2015, dismissing the allegations regarding the conduct of the ICU nurses set forth in count IV of the first amended complaint, with prejudice "for the reasons set forth in the defendant's motion to dismiss." The court further noted that the order of dismissal did not include the plaintiffs' allegations in count IV, regarding the liability of the Hospital for the alleged acts and omissions of Dr. Poulos under the doctrine of *respondeat superior*. The plaintiffs filed a motion to reconsider, which was denied. The plaintiffs then requested a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no just reason to delay an immediate appeal of the dismissal order. That request was also denied. Subsequently, the Hospital filed a motion for summary judgment as to the remaining allegations in count IV, regarding its liability for the conduct of Dr. Poulos. On October 18, 2016, the court granted the Hospital's motion. The plaintiffs then proceeded to trial against Dr. Poulos and the HSHS Medical Group only. The jury returned a verdict finding that the defendants were not liable. The plaintiffs filed this timely appeal. None of the issues raised on appeal are related to the trial itself, and the trial transcript is not a part of the record on appeal.

¶ 23                                     ANALYSIS

¶ 24    On appeal, the plaintiffs contend that the trial court erred in dismissing count IV of the first amended complaint, with prejudice, as time-barred. Initially, the plaintiffs argue that the

10

allegations in count IV are not time-barred because they arose out of the occurrence alleged in the original complaint and relate back to the original complaint.

¶ 25    An assertion that a claim is time-barred is properly raised in a motion for involuntary dismissal under section 2-619(a)(5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(5) (West 2014)). A section 2-619 motion admits as true all well-pleaded facts and all reasonable inferences gleaned from those facts. *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352, 882 N.E.2d 583, 588 (2008). When ruling on a section 2-619 motion, the court interprets all pleadings and supporting documents in a light most favorable to the nonmoving party. *Porter*, 227 Ill. 2d at 352, 882 N.E.2d at 588. An order granting a motion for involuntary dismissal pursuant to section 2-619 is subject to *de novo* review. *Porter*, 227 Ill. 2d at 352, 882 N.E.2d at 588.

¶ 26    Section 2-616(b) of the Code governs the relation-back doctrine. 735 ILCS 5/2-616(b) (West 2014). Section 2-616(b) provides that a cause of action set up in an amended pleading shall not be barred by lapse of time under any statute prescribing or limiting the time within which an action may be brought, if the original pleading was timely filed and if it appears that the cause of action in the amended pleading grew out of the same transaction or occurrence set up in the original pleading. 735 ILCS 5/2-616(b) (West 2014). Section 2-616(b) is intended to preserve causes of action against loss by reason of technical rules of pleading. *Porter*, 227 Ill. 2d at 355, 882 N.E.2d at 589-90; *Boatmen's National Bank of Belleville v. Direct Lines, Inc.*, 167 Ill. 2d 88, 102, 656 N.E.2d 1101, 1107 (1995). Courts will liberally construe the requirements of section 2-616(b) to allow for resolution of litigation on the merits and to avoid elevating questions of form over substance. *Porter*, 227 Ill. 2d at 355, 882 N.E.2d at 590; *Boatmen's National Bank*, 167 Ill. 2d at 102, 656 N.E.2d at 1107.

11

¶ 27   The relation-back doctrine focuses on the identity of the transaction or occurrence rather than the identity of the causes of action. 735 ILCS 5/2-616(b) (West 2014); *Porter*, 227 Ill. 2d at 356, 882 N.E.2d at 590. The rationale behind the same-transaction-or-occurrence rule is that a defendant will not be prejudiced by an amendment if the defendant's "attention was directed, within the time prescribed or limited, to the facts that form the basis of the claim asserted against him." *Simmons v. Hendricks*, 32 Ill. 2d 489, 495, 207 N.E.2d 440, 443 (1965). If a defendant has notice, prior to the expiration of the statutory time limit, of the transaction or occurrence that forms the basis for the claim, the defendant can prepare to meet the plaintiffs' claim, whatever theory it may be based on. *Porter*, 227 Ill. 2d at 356-57, 882 N.E.2d at 591. Courts are to consider the entire record, including depositions and exhibits, to determine whether the defendant had adequate notice of those facts. *Porter*, 227 Ill. 2d at 355, 882 N.E.2d at 590.

¶ 28   In determining whether new allegations in an amended pleading grew out of the transaction or occurrence set up in the earlier pleadings, our supreme court adopted the sufficiently-close-relationship test set forth in *In re Olympia Brewing Co. Securities Litigation*, 612 F. Supp. 1370, 1373 (N.D. Ill. 1985). See *Porter*, 227 Ill. 2d at 360, 882 N.E.2d at 593. Under the sufficiently-close-relationship test, new factual allegations will be considered to have grown out of the same transaction or occurrence set up in earlier pleadings and will relate back "if the new allegations as compared with the timely filed allegations show that the events alleged were close in time and subject matter and led to the same injury." *Porter*, 227 Ill. 2d at 360, 882 N.E.2d at 593. In contrast, an amendment will be considered distinct, and will not relate back, if the original set of facts and the amended set of facts are separated by a significant lapse of time, or if the two sets of facts are different in character or led to arguably different injuries. *Olympia Brewing*, 612 F. Supp. at 1372-73.

12

¶ 29    We now consider the allegations in the original complaint and those in count IV of the first amended complaint in light of the requirements of section 2-616 of the Code and the sufficiently-close-relationship test. In this case, the original complaint was timely filed. The issue is whether the allegations in count IV of the first amended complaint grew out of the same transaction or occurrence set up in the original complaint.

¶ 30    In the original complaint, the plaintiffs alleged that in April 2011, Dr. Poulos became aware that the Medtronic plate at L4-L5 was displaced and that Judith's aorta was tented over that plate. The plaintiffs further alleged that Dr. Poulos was negligent in, among other things, failing to recommend emergency surgery to remove the Medtronic plate after learning that it had been displaced. They claimed that delaying the revision surgery until May 13, 2011, caused a deterioration of the aorta, resulting in the aortoiliac dissection with complete occlusion of the aorta, thus requiring the emergent vascular surgery on May 14, 2011. They further claimed that Judith suffered ischemia and permanent nerve damage in the lower extremities as a direct and proximate result of the negligence. In the original complaint, the plaintiffs asserted that the Hospital was liable as the employer, principal, or partner of Dr. Poulos.

¶ 31    In the first amended complaint, the plaintiffs alleged that in April 2011, Dr. Poulos became aware that the Medtronic plate at L4-L5 was displaced and that Judith's aorta was tented over that plate. The plaintiffs further claimed that Dr. Poulos was negligent in, among other things, failing to recommend emergency surgery to remove the Medtronic plate after learning that it had been displaced and then failing to request a vascular consult soon after the revision surgery. In count IV of the first amended complaint, the plaintiffs alleged that the Hospital personnel, including doctors, nurses, attendants, and others, provided care to Judith in the ICU after the May 13, 2011, revision surgery and that the Hospital personnel were negligent in failing

13

to adequately assess, monitor, document, and report the plaintiff's neurovascular changes, or request a vascular consult, following that revision surgery. The plaintiffs also alleged that Judith's condition continued to deteriorate following the May 13, 2011, surgery and that the continued failure to recognize the neurovascular deterioration resulted in vessel damage to the aorta, resulting in an aortoiliac dissection, with complete occlusion of the aorta, requiring emergent vascular surgery on May 14, 2011. The plaintiff further alleged that as a direct and proximate result of the negligence, Judith suffered ischemia and permanent nerve damage to both of her lower extremities.

¶ 32    After reviewing the pleadings, the accompanying reports of the consulting health care professionals, and excerpts from the depositions of Dr. Poulos and Cynthia Kovach, we find that there is a sufficiently close relationship between the allegations in the original complaint and count IV of the first amended complaint to show that the later allegations grew out of the same occurrence set up in the original complaint. It bears repeating that the focus is not on the identity of the causes of action asserted in the original and amended complaints but rather on the identity of the occurrence. In that regard, the allegations in the original and amended pleadings are focused on the neurovascular compromise that resulted from the delayed revision surgery to remove the displaced plate and on the neurovascular injuries that Judith subsequently suffered as a result of the neurovascular compromise. The postoperative care provided on May 13, 2011, and May 14, 2011, was at issue because of the surgery. The allegations regarding the delayed revision surgery and the failure to closely monitor Judith's vascular status postoperatively were closely connected in time, subject matter, and character, and are stages of a singular occurrence. We also note that the Hospital fully participated in the discovery process. The Hospital had possession of its own records related to the revision procedure and the postoperative care

14

rendered by its nursing staff. It also had the records of Dr. Poulos. The Hospital's attorneys attended the deposition of Dr. Poulos on March 28, 2014, and learned, along with the plaintiffs, that Dr. Poulos would testify he was not notified of Judith's deteriorating condition by the ICU nurses until 4 a.m. on the morning of May 14, 2011. Immediately following the deposition of Dr. Poulos, the plaintiffs notified the Hospital that they wanted to take the depositions of the ICU nurses who cared for Judith postoperatively. Based on this record, we conclude that the Hospital was on notice that the postoperative care in the ICU was a part of the occurrence or series of events that formed the basis of the factual allegations in count IV. This is not a case where a plaintiff is attempting to slip in an entirely distinct claim, based upon a separate nucleus of facts. Accordingly, the trial court erred in dismissing count IV of the first amended complaint.

¶ 33    The plaintiffs also argued, in the alternative, that count IV of the first amended complaint was timely filed under the discovery rule and the statute of repose. Given our determination that the first amended complaint relates back to the original complaint, we need not address these argument on the merits. We do note, however, that, embedded within the arguments raised in the plaintiffs' brief and the responses in the Hospital's brief, there are dueling accusations regarding alleged gamesmanship that occurred during the discovery process. We consider this exchange as an invitation to remind counsel that an enduring goal of the discovery process is full disclosure. Ill. S. Ct. R. 201(b)(1) (eff. July 1, 2014); *Buehler v. Whalen*, 70 Ill. 2d 51, 67, 374 N.E.2d 460, 467 (1977).

¶ 34    Discovery is not a tactical game but rather a procedural tool for the ascertainment of truth for purposes of promoting either a fair trial or a fair settlement. *Ostendorf v. International Harvester Co.*, 89 Ill. 2d 273, 282, 433 N.E.2d 253, 257 (1982). The supreme court rules regarding discovery represent our supreme court's best efforts to manage the complex and

15

important process of discovery. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109, 806 N.E.2d 645, 652 (2004). These rules are neither aspirational nor mere suggestions; they are rules of procedure which have the force of law, creating a presumption that they will be obeyed and enforced as written. *Bright v. Dicke*, 166 Ill. 2d 204, 210, 652 N.E.2d 275, 278 (1995).

¶ 35 Because of these allegations of gamesmanship and because this cause is being remanded for further proceedings, we focus our lens on a few distinct examples of what appear to be "routine practices" in some of our counties, which should not be condoned by the trial court or the litigants. The first is found in the Hospital's responses to the plaintiffs' pattern medical negligence interrogatories and requests for production. We note here that we have chosen to highlight examples from the Hospital's responses simply because those are included in the record before us. Our comments are not intended to be directed solely against the Hospital but should be taken to heart by all litigants.

¶ 36 The Hospital's responses to the plaintiffs' discovery requests contain a prefatory section entitled "General Objections." This section contains four paragraphs. In the first paragraph, the Hospital "objects to plaintiffs' Interrogatories as said Interrogatories are unduly burdensome and overly broad" and "certain of plaintiffs' Interrogatories seek information which is neither relevant nor material to the present cause of action, not likely to lead to the discovery of admissible evidence." In the second paragraph, the defendant objects to "each Interrogatory to the extent that a response may require said defendant to divulge attorney/client communications, information protected by the attorney work product doctrine and/or subject to the Illinois Medical Studies Act, or other privileged information." Also included in the "General Objections" is a disclaimer stating that the responses are the result of a diligent search, but "the defendant cannot determine the knowledge of all of its attorneys, employees, agents or representatives."

16

Initially, we note that nothing in the Illinois Supreme Court Rules or the Code of Civil Procedure allows for this type of prefatory objection. The use of "General Objections" lacks utility and preserves nothing for review because the objections are not directed toward any specific question or request for production. See Ill. S. Ct. R. 213(d) (eff. Jan. 1, 2007); R. 214(c) (eff. July 1, 2014). Further, the disclaimer is misplaced, as litigants and their attorneys have an obligation to provide full and complete answers to each of the interrogatories and requests for production as posed. See Ill. S. Ct. R. 201(b)(1) (eff. July 1, 2014); R. 213(c), (d) (eff. Jan. 1, 2007); R. 214(c) (eff. July 1, 2014). The use of a "General Objection" is a practice that should be discouraged by the trial courts and abandoned by litigants. Best practices require the litigants to follow the requirements set forth in our supreme court rules.

¶ 37     As part of their discovery requests, the plaintiffs submitted the pattern interrogatories for medical malpractice cases, approved by our supreme court. In response, the Hospital first set out its "General Objections." Thereafter, in answer to each interrogatory, the Hospital responded with what are commonly referred to as "boilerplate" objections. Instead of making a specific objection to the specific interrogatory, as required by Rule 213(d), the Hospital offered the following statement: overly broad, unduly burdensome, or irrelevant, without offering any support for making these objections. The Hospital responses included objections to 13 of the 18 pattern interrogatories.

¶ 38     Similarly, the plaintiffs tendered a request for production to the Hospital. Again, the Hospital replied with its "General Objections." As with the responses to the pattern interrogatories, the Hospital interposed its boilerplate objections, overly broad, unduly burdensome, or irrelevant, again, without offering any support for making these objections. The Hospital responded in this manner to 8 of 12 of the requests for production.

17

¶ 39 As noted previously, discovery is not a tactical game, engaged in to avoid access to the truth. Our supreme court has published standard sets of interrogatories, including medical negligence interrogatories, and has encouraged parties to use these approved interrogatories whenever possible, in an effort to avoid discovery disputes. See Ill. S. Ct. R. 213, Committee Comments (rev. June 1, 1995) (paragraph (j)). Rule 213 is designed to give those involved in the trial process a modicum of certainty and predictability that furthers the administration of justice and eliminates trial by ambush. *American Service Insurance Co. v. Olszewski*, 324 Ill. App. 3d 743, 748, 756 N.E.2d 250, 254 (2001). Rule 213(d) requires a party to serve a sworn answer or a specific objection to each interrogatory. Ill. S. Ct. R. 213(d) (eff. Jan. 1, 2007). The supreme court rules regarding discovery do not permit litigants to make objections, without some statement supporting them. Therefore, this habitual practice of setting out a litany of baseless, boilerplate objections is not merely an affront to the supreme court rules, but a perilous practice. Parties who offer general objections or boilerplate objections run the risk of causing unnecessary delay in the orderly process of discovery, needlessly increasing the costs of litigation, having these objections summarily denied, and preserving nothing for appeal.

¶ 40 In many instances, after the litany of objections claiming that the interrogatory was overly broad, unduly burdensome, or irrelevant, there was this familiar refrain, "subject to and without waiving the objections." Then, some type of response was included. Some of the discovery responses seem to be derived from hypertechnical interpretations of the discovery requests. Other responses directed the plaintiffs to generally review two CDs containing a copy of Judith's hospital record, which included more than 5792 pages. The responses did not, however, identify the specific pages in the record where information responsive to the interrogatory or request could be found.

18

¶ 41    Rule 213(e) permits a party to respond to an interrogatory by producing documents responsive to the interrogatory. Ill. S. Ct. R. 213(e) (eff. Jan. 1, 2007). However, it does not permit "dump truck" discovery responses. Here, as previously noted, in response to certain interrogatories, the Hospital directed the plaintiffs to a 5700-page hospital record, but provided no reference or description of the pages or entries in the records where the answers to the question could be found. We do not approve of this practice of simply referring a litigant to thousands of pages of documents without a reference to where the litigant might find the answer being sought. It is not an acceptable substitute for the answers required by Rules 201(b), 213, and 214. See *Singer v. Treat*, 145 Ill. App. 3d 585, 592, 495 N.E.2d 1264, 1268 (1986). The production of a 5700-page hospital record is simply not responsive to an interrogatory seeking the addresses of the occurrence witnesses and the subjects of their testimony as required by Rules 213(e) and 214. This is knowledge uniquely within the possession of the Hospital and should be answered in good faith. Dumping documents on the plaintiffs and asking them to "figure it out" runs contrary to the goal of open discovery.

¶ 42    Another apparently accepted practice is found in the response to an interrogatory seeking the names and addresses of all witnesses who will testify at trial and the basis of their testimony pursuant to Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007). The Hospital objected to the interrogatory as premature in that discovery had not been completed and then reserved the right to disclose witnesses pursuant to supreme court rules and/or any case management order. Rule 213(f) expressly states that upon written interrogatory, a party *must* disclose the subject matter, conclusions, opinions, qualifications, and all reports of a witness who will offer opinion testimony. Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2007). Rule 213(i) imposes on parties a continuing duty to supplement discovery responses. Ill. S. Ct. R. 213(i) (eff. Jan. 1, 2007). The plain

19

language of Rule 213 requires a party to produce the information regarding witnesses upon the service of the written interrogatory and to supplement or amend any prior answer when additional information becomes known to the party. Rule 218 refers to the contents of case management orders. Ill S. Ct. R. 218 (eff. July 1, 2014). It establishes the outside time frame for the completion of all discovery regarding opinion testimony. Rule 218 does not modify the disclosure requirements in Rule 213. A response indicating that disclosure will occur once a case management order has been entered does not comply with the supreme court rules. Therefore, once again, we remind litigants that these procedural rules have the force of law and are to be enforced as written.

¶ 43    In summary, "General Objections," boilerplate objections, and fractional or dump truck disclosures constitute misuse of the discovery process. Such tactics delay the search for truth, impede settlement discussions, waste judicial resources, and should not be accepted by our trial courts.

¶ 44                                  CONCLUSION

¶ 45    Accordingly, the circuit court's order, dismissing count IV of the first amended complaint, is hereby reversed, and the cause is remanded to the trial court with instructions to reinstate the allegations in count IV of the first amended complaint, except as to those allegations against the Hospital for the conduct of Dr. Poulos, which were dismissed pursuant to a summary judgment entered October 18, 2016, and for further proceedings consistent with this opinion.

¶ 46    Reversed and remanded with directions.

¶ 47    JUSTICE GOLDENHERSH, concurring in part and dissenting in part:

20

¶ 48    I concur with the majority's conclusion that the allegations in count IV of the amended complaint relate back and further concur with paragraph 34 of the majority's opinion concerning the purpose of discovery embedded in our supreme court rules and supreme court decisions.

¶ 49    However, the majority's directions on remand, specifically paragraphs 35 through 43 inclusive, in my view constitute an unwarranted invasion of the exercise of discretion by the trial court. As noted in numerous supreme court decisions, in particular those dealing with discovery sanctions under Illinois Supreme Court Rule 219 (eff. July 1, 2002), the concept of discretion of the trial court is acknowledged and embedded in review of a circuit court's decision concerning discovery. In the context of discovery sanctions, numerous supreme court opinions acknowledge the circuit court's discretion and a review on an abuse of discretion standard (see *Buehler v. Whalen*, 70 Ill. 2d 51, 374 N.E.2d 460 (1977); *Boatmen's National Bank of Belleville v. Martin*, 155 Ill. 2d 305, 614 N.E.2d 1194 (1993); *Ashford v. Ziemann*, 99 Ill. 2d 353, 459 N.E.2d 940 (1984); *Sander v. Dow Chemical Co.*, 166 Ill. 2d 48, 651 N.E.2d 1071 (1995); *Shimanovsky v. General Motors Corp.*, 181 Ill. 2d 112, 692 N.E.2d 286 (1998)).

¶ 50    The directions to the parties in paragraphs 33 and 34, and the subsequent paragraphs of paragraphs 35 through 43 on remand, invade the discretionary province of the trial court in determining discovery disputes. The circuit court on remand is perfectly capable of resolving these and similar discovery disputes without appellate mandate predetermining the exercise of their discretion.

¶ 51    Accordingly, I concur with the majority's result as to relation back in the amended complaint and dissent concerning the majority's invasion of the discretion of the trial court to monitor, determine, and enforce our discovery rules.

2017 IL App (5th) 160478

NO. 5-16-0478

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| JUDITH K. SIMPKINS and ROBERT L. SIMPKINS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellants, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 13-L-183 |
| | ) | |
| HSHS MEDICAL GROUP, INC., d/b/a Southern | ) | |
| Illinois Brain and Spine Center; | ) | |
| NICHOLAS E. POULOS, M.D.; HOSPITAL SISTERS | ) | |
| HEALTH SYSTEM; and ST. ELIZABETH'S | ) | |
| HOSPITAL OF THE HOSPITAL SISTERS OF | ) | |
| THE THIRD ORDER OF ST. FRANCIS, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | Honorable |
| (St. Elizabeth's Hospital of the Hospital Sisters of | ) | Vincent J. Lopinot, |
| the Third Order of St. Francis, Defendant-Appellee). | ) | Judge, presiding. |

---

**Opinion Filed:** December 8, 2017

---

**Justices:** Honorable Judy L. Cates, J.

Honorable Melissa A. Chapman, J., concurred
Honorable Richard P. Goldenhersh, J., concurred in part and dissented in part

---

**Attorneys for Appellants** Robert W. Schmieder II, Bradley M. Lakin, SL Chapman LLC, 330 North Fourth Street, Suite 330, St. Louis, MO 63102

---

**Attorneys for Appellee** Michael J. Nester, Chi-yong Throckmartin, Jason M. Gourley, Donovan Rose Nester, P.C., 201 South Illinois Street, Belleville, IL 62220